YELLOW FREIGHT SYSTEM,
INC., Appellee,

v.

UNITED STATES of America, Appellant.

No. 75–1670.

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1976.

Decided June 15, 1976.

William A. Whitledge, Tax Div., Dept. of Justice, Washington, D. C., for appellant; Bert C. Hurn, U. S. Atty., Scott P. Crampton, Asst. Atty. Gen., and Gilbert E. Andrews, Jr. and Gary R. Allen, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief.

George E. Gibson, Kansas City, Mo., for appellee; Reece A. Gardner and Sheryl B. Etling, Kansas City, Mo., on brief.

Before LAY, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

This suit was brought by Yellow Freight System, Incorporated (hereinafter taxpayer) against the United States to recover federal income taxes and assessed interest in the amount of $203,498.76 for the taxable years 1963, 1964, 1965 and 1966. The controlling issue on this appeal is whether certain docks, dock additions and inspection lanes, constructed by the taxpayer in the years at issue, are investment credit properties within the meaning of section 48(a)(1)(B) of the Internal Revenue Code, 26 U.S.C. § 48(a)(1)(B) (1970), *as amended,* 26 U.S.C. § 48(a)(1)(B) (Supp. IV, 1974) (hereinafter § 48(a)(1)(B)).[1] Resolution of this issue depends on whether the structures are "buildings" under § 48(a)(1)(B) and thus ineligible for the investment credit. The court below held that the structures are not

---

1. In district court, the taxpayer also claimed that certain fences constructed at various terminals were qualified properties under the investment credit provisions of the Code. The district court found that the fences were qualified investments and allowed the credits. The United States does not contest this aspect of the judgment below on this appeal.

buildings and entered judgment in favor of the taxpayer.[2] We reverse.

## I.

The investment credit provisions of the Code, 26 U.S.C. §§ 38 *et seq.*, allow a credit with respect to certain qualified investments in depreciable property. At all times relevant to this lawsuit, the credit was allowable in an amount equal to seven percent of any qualified investment under § 46(a)(1).[3] Section 48(a) of the Code defines the property, termed "section 38 property," which qualifies for the investment credit. During the years in question, § 48(a)(1) read as follows:

(a) Section 38 property.—

(1) In general.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (*not including a building and its structural components*) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction *or of furnishing transportation,* communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), or

(C) * * *.

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more. (Emphasis supplied.)

In the years 1963 through 1966, Yellow Freight caused to be constructed thirteen docks, nine dock additions and four inspection lane facilities. In each instance the taxpayer claimed, and the government de-

nied, an investment credit for these facilities, the cost of which varied from a low of $6,599.77 to a high of $530,487.89.

The parties stipulated that the properties in question qualified for the full investment credit in all particulars except one. The structures at issue were, when constructed, and are now, "other tangible property" under § 48(a)(1)(B). Depreciation was allowable with respect to the properties when each was constructed and each had a useful life of eight years or more for purposes of computing depreciation under § 167 of the Code. The properties were at all relevant times used by the taxpayer as an integral part of furnishing transportation services under § 48(a)(1)(B)(i). The only remaining question then, and the point upon which the Service denied the credit in each instance, is whether the structures are "buildings" which are ineligible for the credit.

Taxpayer is a common carrier of general freight operating in interstate commerce. The company hauls general freight by motor truck over ICC certified routes in Arizona, California, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Missouri, New Mexico, Ohio, Oklahoma and Texas. Taxpayer uses terminals along these routes in order to expedite the transfer of freight.

The transportation services which taxpayer provides are divided into the following four categories: outbound service, inbound service, break bulk operations and interline operations. In performing its outbound service, taxpayer's trucks pick up goods from a customer within the commercial zone which a terminal serves. Freight is taken by truck to the terminal and transferred to an outbound long-haul trailer for delivery to other destination cities. Inbound service is the opposite of outbound service. Long-haul trailers arrive at a terminal carrying freight destined for customers in the commercial zone served by such terminal. Freight is transferred to other

2. The district court's opinion, which includes a detailed statement of the facts of this case, is reported at 413 F.Supp. 357 (W.D.Mo.1975).

3. In the Tax Reduction Act of 1975, Congress increased the allowable credit to ten percent of the cost of a qualified investment. Act of March 29, 1975, Pub.L. No. 94–12, § 301(a), 89 Stat. 36, *amending,* 26 U.S.C. § 46(a)(1) (1970).

trucks which deliver it to the customers within the commercial zone. Break bulk operations, which take place in Albuquerque, Baxter Springs (Kansas), Dallas, Indianapolis and St. Louis, involve the transfer of freight from inbound long-haul trailers to outbound long-haul trailers. Interline operations involve freight which is transferred from a trailer of another carrier to outbound trailers of the taxpayer.

The method of freight transfer is similar in each case. An arriving vehicle is backed up to a dock stall. The freight is unloaded and moved by forklift or cart to another dock stall where the freight is loaded into other trailers.[4]

Functionally, the docks at issue facilitate the movement of freight from inbound to outbound transportation vehicles. They provide a flat loading and unloading area under protective cover which is readily accessible to incoming and outgoing vehicles. The number of employees who work on the docks varies from a maximum of 80 full time employees per 8 hour shift at the St. Louis dock to a minimum of 5 part time employees per 8 hour shift at the Davenport dock. The average number of trucks loaded and unloaded per day at the docks varies from eleven at Sandusky and Tucson to three hundred at St. Louis.

Structurally, the docks are rectangular in appearance. The dimensions vary. The smallest in Waco, Texas is 40' x 40' x 17' 10". The largest in St. Louis is 81' x 757' x 21' 2". The dock platforms consist of a concrete slab, normally six inches thick, which is raised approximately four feet off the ground to a height suitable for access to truck beds. The slabs are generally supported by concrete perimeter foundation walls and dirt or other filling material.[5] Each dock has a preengineered metal roof supported by eleven to twelve foot steel columns placed at twenty-two foot intervals along the length of the structure. Roof support crossbeams are placed over each laterally opposed pair of columns. Roof framing members, consisting of six inch deep steel purlins, run longitudinally on top of the crossbeams at five to six foot spacings. Roof sheeting is attached to the top of the purlins and forms the roof. The roof typically extends eight feet beyond the dock in order to provide cover for vehicles while loading and unloading takes place.

The office building at each of the terminals adjoins the dock. At most of the terminals, the office floor is contained within the same perimeter foundation walls that surround the dock. At most of the terminals, the dock roof extends as one continuous unit over the office building. Thus the docks and office buildings typically share the same roof and foundation.

None of the docks at issue are enclosed within walls. The docks which operate twenty-four hours a day, seven days a week (Indianapolis, Dallas and St. Louis) are open at all times and have no doors. All other docks have sectional overhead doors for each stall which are raised during working hours and lowered during nonworking hours.

There are a number of electrical outlets on each dock. All (except the St. Louis dock) are equipped with overhead fluorescent lighting and half of the docks have telephones. Most have spotlights used to illuminate the inside of trailers being loaded or unloaded. None have air conditioning. Only three docks (Davenport, St. Louis and Waco) have heaters. There are no restroom facilities on the docks (except at Indianapolis) and, during the time at issue, none had lunchroom facilities.

At trial, the government offered the expert testimony of Charles Kahn, Professor of Architecture and Dean of the School of Architecture and Urban Design at the University of Kansas, and William Lucas, also a

---

4. Freight is stored on the docks only if no trailer is immediately available for loading. Generally such freight remains at the terminal no longer than 24 hours.

5. The slab in St. Louis and a portion of the slab in Indianapolis are supported by spandral beams on piers with no filling under the slabs. Sleeping facilities, toilets and showers are contained beneath the slab at the Indianapolis dock.

Professor of Architecture and Urban Design at Kansas University. Kahn and Lucas viewed a film depicting the Detroit and St. Louis terminals, selected by the parties as typical of those at issue. Both Kahn and Lucas visited the Kansas City terminal which taxpayer characterized as typical of the dock structures. They also viewed selected architectural and engineering drawings of a number of the facilities in question.

Both concluded that the docks are "buildings" in the architectural sense of the term. Kahn stated that the dock structures are buildings in both the technical and operational sense. He indicated that the structures are neither uniquely designed nor uniquely functional. They were, according to Kahn, constructed with standard building elements and preengineered components and could be converted to a variety of other uses with a minimum of structural and building material changes.[6] The evidence offered by Lucas corroborated Kahn's conclusion. This expert evidence was essentially uncontroverted by the taxpayer.

The inspection lanes are located at taxpayer's breakpoint terminals (Albuquerque, Baxter Springs, Indianapolis and St. Louis). They serve to expedite the fueling, cleansing and inspection for safety and roadability of long-haul vehicles.

The inspection lanes are drive through structures; a vehicle is driven through a lane where it is fueled, and its tires, battery, radiator, horn, brakes, lights and signal indicators are checked. Parts are tightened or adjusted and burned out light bulbs are replaced if necessary. No other repair work is performed at the inspection lanes. If a truck requires further repair, the truck is taken to the shop building where the repair work is done.

The inspection lanes at each of the four locations are in continuous operation. "Lead mechanics" coordinate the inspection process. "Mechanics" fuel the vehicles, clean windows, inspect safety equipment and make minor repairs. "Servicemen" also fuel the vehicles, clean windows and inspect safety equipment. The personnel required to operate the inspection lanes varies from 4 per 8 hour shift to 11 per 8 hour shift.

Structurally, the inspection lanes are rectangular with a six inch concrete slab at ground level and a roof similar to the docks. The dimensions of the inspection lane facilities vary from 60′ to 75′ in width; from 98′ to 222′ in length; and from 16′ to 19′ in height.

Each structure is attached on one end to a wall of the shop building. The other end is covered with metal siding, except in St. Louis where it is open. The structures (except in St. Louis) have sectional overhead doors on one side which can be raised and lowered. They are divided into lanes approximately fourteen feet wide. Each lane is partially separated by metal uprights which support the roof and by posts from which are hung fuel, water and air hoses. There is a forced air heating system in the St. Louis structure. The other facilities have overhead space heaters (except at Baxter Springs). The heaters serve to keep the floors of the lanes dry by melting snow and ice from the trucks being inspected. The facilities each have overhead fluorescent lighting, several electrical outlets, and floor drains. None have air conditioning, lunchroom or restroom facilities.

## II.

In 1962, the investment credit provisions of the Code were passed by Congress in order to improve our competitive position abroad and to stimulate the economy by encouraging the modernization and expanded use of capital equipment and machinery. S.Rep. 87–1881, U.S.Code Cong. & Admin. News pp. 3297, 3304, 3314 (1962). The "building" exclusion in § 48(a)(1)(B) resulted from the contemporaneous passage of § 1245 of the Code which closed a then existing tax loophole. This loophole had theretofore allowed conversion of ordinary

---

6. Kahn stated that the docks were structurally comparable to the following: manufacturing plants, storage warehouses, garages, auto showrooms and bottling plants.

income into capital gains with respect to many dispositions of depreciable property. The President and Congress expressed a desire to close this loophole especially since acquisition of such property was to be encouraged through tax incentives such as the investment credit. S.Rep. 87–1881, *id.* at 3398. Accordingly, § 1245 required that certain gains on dispositions of depreciable property be treated as ordinary income where excessive depreciation deductions had been previously allowed to offset ordinary income on such property. Congress did not, however, apply the recapture rule of § 1245 to buildings and other fixed realty because " * * * it recognized the problem in doing so where there is an appreciable rise in the value of real property attributable to a rise in the general price level over a long period of time." S.Rep. 88–830, U.S.Code Cong. & Admin.News pp. 1673, 1806 (1964). The same "building" exclusion which appeared in § 1245 was incorporated into the definitional section (§ 48) of the investment credit provisions.[7]

 Section 38(b) of the Code directed the Treasury to promulgate regulations necessary to carry out the investment credit. In response to this congressional directive, the Treasury drafted Treas.Reg. § 1.48–1(e), which defines the term "building" under § 48(a)(1)(B). Section 1.48–1(e)(1) reads as follows:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.[8]

This regulation conforms to the congressional understanding of the term "build-

---

7. In 1964 Congress filled the gap created by the "building" exclusion in § 1245 by adding § 1250 to the Code. Act of Feb. 26, 1964, Pub.L. No. 88–272, § 231(a), 78 Stat. 100. Section 1250 requires somewhat milder depreciation recapture with respect to buildings and other realty.

8. In 1972, § 1.48–1(e)(1) was amended by T.D. 7203, 1972–2 Cum.Bull. 12, 24 to read in the form set forth above. The 1972 amendment did not change the first four sentences of the regulation. Before the amendment, the remainder of the regulation read as follows:

Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) an enclosure which is so closely combined with the machinery or equipment which it supports, houses, or serves that it must be replaced, retired, or abandoned contemporaneously with such machinery or equipment, and which is depreciated over the life of such machinery or equipment. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, coke ovens, brick kilns, and coal tipples.

The taxpayer's docks and inspection lanes are "buildings" under either version of the regulation.

ing," see The Technical Explanation of the Bill, U.S.Code Cong. & Admin.News pp. 3439, 3456 (1962), and follows Congress' intent that the term "building" be given its commonly accepted meaning. *Id.* The regulation is within the granted power, issued pursuant to a proper procedure, and reasonable. It is, therefore, a legislative regulation which is as binding on this court as the statute itself. *Kramertown Co., Inc. v. Commissioner of Internal Revenue,* 488 F.2d 728, 730 (5th Cir. 1974).

■ The regulation and relevant legislative history define "building" in terms of both physical appearance and function. Accordingly, we consider both the physical appearance and function of the structures at issue in determining whether they are "buildings" under § 48(a)(1)(B). *See Sunnyside Nurseries,* 59 T.C. 113, 119 (1972); *Arne Thirup,* 59 T.C. 122, 127 (1972), *rev'd,* 508 F.2d 915 (9th Cir. 1974); *Melvin Satrum,* 62 T.C. 413, 418–420 (1974) (Judges Dawson, Raum, Drennan and Quealy, dissenting).

The docks at issue clearly resemble buildings in their design and structural appearance. The facilities are permanent structures with substantial dimensions. At trial, Professor Kahn indicated that the docks are not structurally different from buildings used for other purposes. Each has a permanent concrete foundation, a rigid frame structure or column beam system, and a permanent sheet metal roof, which together provide sheltered work space. The docks typically share the same foundation and roof with office buildings and shop buildings (when present) which taxpayer does not argue to be "nonbuildings." Although the docks do not have walls in the strict sense of the term, most have overhead doors which can be lowered to fully enclose the freight transfer area during nonworking hours.[9]

The docks function as buildings. It is true, as the taxpayer argues, that the general purpose of the docks is to expedite the transfer of freight. However, the freight is not expeditiously transferred by the buildings themselves. The docks provide shelter and work space (functions commonly attributed to buildings under both the regulation and legislative history) so that the men and machines therein can expedite the transfer of freight.

Structurally, the inspection lanes also resemble buildings. They are permanent structures which have substantial dimensions like the docks. The inspection lanes each have a concrete foundation, rigid frame structure, and roof which provide sheltered work space. Each inspection lane structure shares one wall with a shop building. The other end of each structure (except in St. Louis) is enclosed with metal siding. Although two sides are typically open, these facilities have overhead doors which can close one of the two open sides.[10]

The inspection lanes similarly function as buildings. These facilities are generally used to expedite the fueling, cleansing and inspection for safety and roadability of long-haul vehicles. But the structures themselves do not perform this function. The men and equipment perform this function. The inspection lane facilities, like the docks, provide shelter and work space so that the men and equipment can perform their functions.

This analysis does not end our inquiry however because Treas.Reg. § 1.48–1(e)(1) provides that the term "building" does not include: 1) a structure which is essentially an item of machinery or equipment, or 2) a structure which is so closely related to the property which it houses that it must be replaced contemporaneously with such property. Taxpayer does not claim that the structures are so closely related to the prop-

---

9. We do not regard as controlling the fact that the docks have no clearly discernible walls. Cf. *Robert E. Catron,* 50 T.C. 306, 312 n.4 (1968). Section 1.48–1(e)(1) " * * * furnishes only a general description which does not attempt to define in exact terms the outer

limits of what may properly be categorized as a 'building.' " *Id.*

10. That the inspection lanes, like the docks, have no clearly discernible walls is not controlling. See note 9, *supra.*

erty which they house that contemporaneous replacement or retirement is required. Taxpayer does suggest that implicit in the district court's opinion is a finding that the structures function as items of machinery or equipment rather than as buildings.

█ We find no such finding in the district court's opinion. Assuming the district court made such a finding, implicitly or explicitly, such finding would be clearly erroneous. To be sure, the docks and inspection lanes are directly involved in expediting the movement of goods in the taxpayer's transportation business. But to characterize them as "machines" or "equipment" on this account would distort the commonly accepted meaning of such terms. *Cf. Sunnyside Nurseries, supra,* 59 T.C. at 121. A substantial amount of employee activity occurs within the structures.[11] Thus, while the docks and inspection lanes do aid in expediting the movement of goods, they do so only by providing sheltered work space for the employees, machines and equipment contained therein.

The district court applied a "functional" test and found that the docks and inspection lanes were " * * * specialized structures 'whose utility is principally and primarily a significantly contributive factor' in the furnishing of efficient and reliable transportation services." 413 F.Supp. at 367, *quoting Thirup v. Commissioner,* 508 F.2d 915, 919 (9th Cir. 1974), *rev'g,* 59 T.C. 122 (1972). The court found that the "sole function" of the docks and dock additions is to facilitate the transfer of freight. The court also found the inspection lanes serve the highly specialized function of promoting efficiency, speed and safety of freight transfer. The court concluded that because of their specialized functions, the structures are not "buildings" under § 48(a)(1)(B).

█ We reject the district court's application of the "functional" test, to the extent that it ignores the appearance of the structures at issue and to the extent it relies on the rationale of *Thirup v. Commissioner, supra,* relating to the importance of the amount of employee activity carried on in the structure. The regulation and legislative history require consideration of both appearance and function. Thus the functional test, as it was applied by the district court, makes a nullity of the language, "[t]he term 'building' generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, * * * ", which appears in both the regulation and the legislative history.

Furthermore, the "functional test," in our view, is no less "imprecise" than the "appearance test" (which ignores the function of a structure). The functional test purportedly carves out for the credit those types of specialized structures whose utility is principally and primarily a significantly contributive factor in providing the services listed in § 48(a)(1)(B)(i). However, it may be said that all industrial buildings principally and primarily contribute to furnishing services listed under § 48(a)(1)(B)(i). Bus stations and railroad stations, which do not qualify for the credit because they are "buildings," are no less "specialized" in this sense than the docks at issue. Likewise, garages, which also do not qualify for the credit, are no less specialized than the inspection lanes in question.

█ Moreover, the "functional test" proceeds from the premise that consideration of appearance somehow distorts the meaning to be given the term "building" under § 48(a)(1)(B). We disagree. Appearance and function are not mutually exclusive. Indeed a given structure is designed to ac-

---

11. We consider the amount of human activity which occurs within the structures an important consideration under § 48(a)(1)(B) since "buildings," according to Treas.Reg. § 1.48–1(e)(1), typically provide work space for such human activity. *Cf. Sunnyside Nurseries, supra,* 59 T.C. at 121; *Brown-Forman Distillers Corp. v. United States,* 499 F.2d 1263, 1271–1272 (Ct.Cl.1974) (distinguishing *Sunnyside*

*Nurseries* on this basis). *But see Thirup v. Commissioner,* 508 F.2d 915, 919 (9th Cir. 1974), *rev'g,* 59 T.C. 122 (1972). The quantum of employee activity is, in our opinion, critical in determining whether the function of a given structure is principally, or only incidentally, to provide work space. In this respect we decline to follow the rule in the Ninth Circuit.

commodate the functions for which it is to be used. Thus consideration of appearance adds to, instead of detracts from, the common understanding of the term "building."

The docks and inspection lanes at issue resemble buildings in both form and function. We hold, therefore, that the docks and inspection lanes are "buildings" within the meaning of § 48(a)(1)(B) of the Code.

### III.

In the district court, taxpayer claimed the credit for the cost of five enclosed and heated rooms used for the protection of cargo which could be damaged by cold temperatures. One of these facilities is located within each of the taxpayer's terminals at Cincinnati, Davenport, Flint, Sandusky and Toledo. The cost of each was $1,088. The record before us is inadequate to determine whether these facilities are qualified properties under § 48(a)(1)(B). The district court made no specific findings with respect to these properties although the cost of each was allowed as a credit. Therefore we direct the district court to take further evidence, if necessary, and determine whether these properties separately qualify for the credit.[12]

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with the views expressed in this opinion.

12. These structures arguably qualify for the credit as "storage facilities" under § 48(a)(1)(B)(ii). The use or function of these structures is of controlling importance in determining whether these facilities are "buildings" or qualifying "storage facilities." *See Brown & Williamson Tobacco Corp. v. United States,* 369 F.Supp. 1283, 1287 (W.D.Ky.1973), *aff'd per curiam,* 491 F.2d 1258 (6th Cir. 1974); *Central Citrus Co.,* 58 T.C. 365, 371 (1972). The reason is that Treas.Reg. § 1.48–1(e) (1), which defines "building," must be read in conjunction with Treas.Reg. § 1.48–1(d)(5), which defines "storage facilities." The definition of "storage facilities" in § 1.48–1(d)(5) is couched primarily in functional terms and the cases have held that the critical determination is whether a given structure is *used* principally for work space or storage space. *See Robert E. Catron, supra,* 50 T.C. at 315; *Brown & Williamson Tobacco Corp. v. United States, supra,* 369 F.Supp. at 1288; Rev.Rul. 66–89, 1966–1 Cum. Bull. 7, 8–9. We also note that "storage facilities" which otherwise qualify for the credit under § 48(a)(1)(B)(ii) are not disqualified solely because they are housed within structures determined to be "buildings." *Robert E. Catron, supra,* 50 T.C. at 313–314.