**STUPPY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 77–0659–CV–W–3.**

United States District Court, W. D. Missouri, W. D.

Aug. 10, 1978.

---

## MEMORANDUM AND ORDER

RUSSELL G. CLARK, District Judge.

Plaintiff-taxpayer Stuppy, Inc., formerly Stuppy Floral, Inc., having filed claims of entitlement to investment tax credits with respect to certain greenhouse structures, and having these claims disallowed by the Internal Revenue Service, brought this action to recover a portion of federal income taxes paid for the fiscal years ending June 30, 1973 and 1974. This Court has jurisdiction of this refund action pursuant to 28 U.S.C. § 1346(a)(1).

The issue in this action is whether or not the taxpayer's greenhouses, constructed during the taxable fiscal years in question, are investment credit properties within the meaning of 26 U.S.C. § 48 to qualify for the tax credit authorized by 26 U.S.C. § 38. The United States has stipulated that the subject structures qualify in all respects for the investment tax credit [1] but the government contends that the greenhouse structures are "buildings" and consequently not eligible for the tax credit.

Trial was before the Court commencing July 17, 1978. After careful consideration of the evidence and the legal briefs of counsel, and for the reasons set forth herein, judgment is granted in favor of the plaintiff taxpayer and against the defendant United States.

### I. FINDINGS OF FACT

Generally described, the structures in question consist of six structures or units which are arranged "side by side". Five of the units are thirty feet wide and two hundred and sixty feet long. The smaller remaining structure is of the same width but is one hundred seventy-six feet long. Each unit is covered by a "rainbowed"-arched framework of metal pipes. This metal framework forming the typical curving roof

Robert E. Fitzgerald, Jr., Hoskins, King, McGannon, Hahn & Hurwitz, Kansas City, Mo., for plaintiff.

Barry Lieberman, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

---

1. The statute provides that Section 38 property must be depreciable and have an estimated useful life of three or more years.

on this type of structure is covered with light emitting fiberglass reinforced plastic panels, each panel clad with a tedlar film layer. More specifically, as stipulated by the parties, with respect to the structures claimed for the fiscal year ending June 30, 1973, the five units consist of a series of stake pipes. These stake pipes are of one and one quarter inch steel galvanized pipe, schedule 40, with a designation of L50, as designated by the manufacturer, Laclede Steel of Alton, Illinois. The stake pipes are approximately eight and one-half feet in height, of which two and one half feet are embedded in a concrete pier eight inches in diameter and three feet deep. Because the units are contiguous, the stakes on the interior connections of the units are double stakes bolted together.

Into these stakes are fitted one inch bowed pipes. These pipes have been rolled for an arch. The two arches are connected at the apex by a connecting piece of pipe to form the rainbow. There is a stake and bow assembly every four feet of the length of the units. The arches are then connected by a purlin or longitudinal member. There are three such purlins in each unit: at the crown, and one half way down either side of the bowed arches. These purlins are three quarter inch pipe, schedule 40, and are connected to the bows. Where the contiguous units meet, a common gutter arrangement is attached in the "V" formed by the two arches coming into the stakes.

The entire structure is covered with a fiberglass reinforced plastic panel covering. The panels are corrugated and weigh only five ounces per square foot. Each panel is clad with a Dupont tedlar film layer.

On the east ends of the individual structures are framed fiberglass doors for access to the outside. Also on the east side are large exhaust fans. At the west end there is a bank of louvered shutters which open into a lean-to type affair which is constructed of wood and houses the fan and aspen pad cooling system. This cooling system operates on the evaporative principle in that water spreading over the shaven aspen wood is evaporated by the air entering the greenhouse. This air is drawn into the structure and across the wet pad by a negative air pressure created by the exhaust fans forcing air out of the structures on the east end.

The heating system consists of gas heaters located inside the structures. These heaters, by way of a jet fan, force warm air down a polyethylene tube called a convection tube which has holes at specific dimensions and of specific size down the length of the tube. This tube runs the entire length of each greenhouse. The purpose of the convection tubing is to evenly distribute the heat when the heaters are in operation and to circulate the air when the fans are running independently of the heaters. This heating and cooling system, regulated by thermostat, is required to maintain the temperature and humidity levels conducive to the growing of potted plants. On a bright sunny winter's day, the temperature inside the greenhouse can rapidly climb over 100°F. which necessitates the ventilation of outside air. At night, however, due to the lack of insulation, extensive heating is required. In the summer months, the temperatures inside the greenhouse can soar beyond 120°F. if left unregulated by the aspen pad cooling system. The humidity level remains quite high throughout the year due to extensive watering and misting of the plants and due to the natural "greenhouse" effect. This warm and humid atmosphere is not conducive to normal human activity and therefore all of the human activity that does occur within the greenhouse is directly related to the production of the commercially grown flowering and foliage crops.

With respect to the structure claimed for fiscal year ending June 30, 1974, it is also thirty feet wide, but is only one hundred seventy-six feet long. It is constructed in the same manner as the other greenhouses, however the interior is divided into two sections. One half is utilized for the growing of foliage house plants rather than flowering potted plants and the other half is utilized for propagation; therefore, it is equipped for a greater heating capacity.

The structure's fiberglass paneling is less opaque which allows for a lower light transmission suitable for these more delicate plants.

In conjunction with this greenhouse complex a "headhouse" facility [2] was constructed in 1974. This facility utilizes the same Stuppy designed structure, but was built on taller columns to allow for installation of an overhead garage door permitting trucks to enter the structure. The "headhouse" covering is coated so that only 10% available light enters through the opaque covering as compared to the 90% figure in the greenhouses. The interior of this facility contains wood framed structures providing office space for the head grower, a lunchroom facility for the workers, and restroom facilities. The entire building is heated but only the office and lunchroom are air conditioned. The remainder of the headhouse is used for storage space for miscellaneous items including soil, boxes, wheelbarrows, and electric forklift trucks. Eight-foot wide passages on both longitudinal walls of the headhouse permit easy access to all greenhouses.

In the years in question, as many as thirteen people were employed by the plaintiff to maintain the flowering crops which consisted of azaleas, rieger begonias, Christmas cactus, chrysanthemums, cyclamen, fuchsia, glozinias, hyacinths, hydrangeas, lilies, poinsettias, geraniums, and several other varieties of blooming plants, as well as green foliage plants. This work force performed the varied tasks of soil mixing, potting, fertilizing, applying insecticides, spacing, pinching, watering by hand if necessary, moving the plants, and other greenhouse related activities. Evidence was introduced that categorized the tasks into eleven individual processes: plant, pinch, move or space, drench, water, spray, growth retard, cloth, disbud, fertilize, and shipment. Not each crop requires all of the eleven processes, while some crops (such as chrysanthemums) require each of the eleven

tasks. Michael K. Deardorf, Stuppy's grower at this greenhouse complex located in St. Joseph, Missouri, testified that without this human activity, no commercially marketable flowers or plants could be produced. As stated, all of the activity performed inside the greenhouse is directly related to the production of plants.

Although the Stuppy [3] designed rainbow arched structures were designed and constructed specifically for the commercial production of flowers and plants by providing a climate controlled environment, at least two buyers of Stuppy greenhouses have purchased these structures for purposes other than as greenhouses. There was testimony to the fact that one individual purchased a single unit to be used as a swimming pool covering, but this proved unsuccessful and it was removed. Another unit was sold for the purpose of housing a sewage treatment apparatus, but there was no testimony as to its current or continued usage. In regard to the possibilities of alternative usage of these particular structures, Dean Charles H. Kahn, Professor of Architecture and Dean of the School of Architecture at the University of Kansas testified that utilizing a safety factor of 1.5 the structural strength of the arched roofs of these greenhouses was calculated to be 4.6 lbs/sq. ft. Dean Kahn testified that this was below the 10 lbs/sq. ft. which is normally said to be required to support the weight of an average winter snowfall. Furthermore, he stated that 20 lbs/sq. ft. was the normal minimum limit for those structures utilized for human occupancy, and although some structures had limits as low as 10 lbs/sq. ft. they were not used as public facilities. The unusually low live-load capacity of the Stuppy greenhouse structures was explained on the basis that large accumulations of snowfall would be prevented by the convection of heat through the fiberglass coverings. Because of this structural characteristic—dependence upon high temperatures to prevent

---

2. No tax credit was claimed for the "headhouse structure".

3. Stuppy, Inc. also is in the wholesale greenhouse supply business and markets its "Rainbow Greenhouses" to other growers.

snow accumulations on the arched roofs—and because of the low live-load capacity, Dean Kahn testified that it was his opinion that the structures could not be safely[4] converted to any other use which would involve extensive human activity inside the structures. The Court accepts the opinion of Dean Kahn in this regard.

Professor Robert Burns of North Carolina State University School of Architecture testified that with modification and perhaps the addition of facilities and elements to the basic structures, the greenhouses could be utilized for other purposes. He also stated that it was practically possible in his opinion to move and use the structures in conjunction with other structures for other commercial or recreational purposes.

The Court finds that moving these particular structures for alternative uses is physically possible, but economically not feasible. Furthermore, because of the specific design and construction for the elevation and maintenance of temperature, humidity, and light, any other usage besides that of horticulture would necessitate costly and major renovations and modifications. Mr. Maudlin, a banker who testified for the plaintiff, stated that indeed his bank categorized the loan on the structures to be an equipment loan rather than a building loan because of the "special purpose construction and design". The structures were built at a total cost of approximately $200,000 including equipment. Stuppy has since ceased operating the greenhouses and recently sold them for $20,000 to an individual who will remove them from the site.

There also was a difference of expert opinion testimony as to whether the greenhouses are, in fact, machines. One definition repeatedly used at trial was that a machine is merely a combination of elements which, working on power, create an effect. Therefore, it was proposed that the greenhouse structure, utilizing the sun's energy, and the interaction of the soil and water, produce plants. This Court makes no specific finding as to whether a greenhouse is within the definition of a machine, but does note that given that definition, an operating greenhouse structure is more "machine-like" than an ordinary factory building which provides mere shelter for human activity in the production of goods.

## II. CONCLUSIONS OF LAW

The provisions of 26 U.S.C. § 38 allow a direct credit against income tax liability for investments in certain property, known as "section 38 property". The eligible property which qualifies for the investment tax credit is defined in section 48. That section reads in pertinent part:

(a) section 38 property—

(1) *In general*—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property; or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or    .    .    .

Because it is undisputed that in the climate of St. Joseph, Missouri, a greenhouse is the necessary integral part of the production of commercially marketable flowers and plants on a year-round basis, the sole issue is whether under § 48(a)(1)(B) the greenhouse structures are buildings within the contemplation of Congress and the statute. If they are buildings, the plaintiff is ineligible for the investment tax credit and the claimed refunds must be denied. Conversely, if the structures are non-buildings under this particular statute, then the plaintiff is entitled to the claimed refunds, the exact dollar amount of which is not in dispute. For the reasons stated, this Court finds the issue in favor of the plaintiff.

To assist in the determination as to what is considered a building under this section, Treasury Regulation § 1.48–1(e) reads as follows:

---

4. Mention was made at trial of the flammability of the plastic type covering but the Court makes no finding as to it being a factor in the possibility of conversion to other purposes.

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

As stated in *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 795–6 (8th Cir. 1976), this regulation follows Congress' intent that the term "building" be given its commonly accepted meaning.

■ A Court in its determination of whether a structure is a building under the provisions of this statute must consider both the physical appearance and function of the structures at issue. *Yellow Freight,* supra, 538 F.2d at 796. That is, within this Circuit neither the appearance test nor the functional test should be controlling, whereas in other circuits the functional test is determinative. See *Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915 (9th Cir. 1974).

■ In considering the appearance or form of these structures, the regulation directs attention to basic form:

> The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof . . .

The structures herein in question possess walls which enclose space and are covered by their arched roofs. However, just as a structure without a roof may be a building, see *Yellow Freight,* 538 F.2d at 796, n. 9 citing to *Robert E. Catron,* 50 T.C. 306 (1968), a structure with a roof may not be a building under this regulation. Much emphasis was placed in *Yellow Freight* upon the structural permanence and rigidity of the loading docks in question in that case. Consequently, an open air sports stadium would probably be considered a building despite its absence of a roof. Houses, factories, office buildings, warehouses, barns, garages, railway or bus stations (all cited as examples of buildings by the regulation) possess structural rigidity and permanence as well as generally "appearing" in form as buildings. A building used as a residence is called a house, but if used for offices it remains a "building" yet is named by its function as an office building. So too, by way of example, a building which functions as a warehouse may be converted to indoor tennis courts but it remains a building in form and appearance.

In contradistinction, the term "greenhouse" defines a structure's form *and* function. The form of a greenhouse consists largely of glass, plastic, or some other synthetic opaque substance. Its appearance is one of less permanence and rigidity than is normally associated with what is commonly termed "buildings" and differs greatly from the examples cited in the regulation. A

greenhouse emits larger quantities of light than is normally emitted by "buildings". Because its purpose is to create an environment, rather than to protect its occupants from the existing environment, a change in its basic function would dictate major structural modifications which would cause it to cease being a greenhouse.

The regulation also presents a functional test, defining a building to be a structure:

the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display or sales space.

Exceptions to the definition are structures which are essentially items of machinery or equipment, or structures which house property used as an integral part of an activity specified in § 48 (manufacturing, production etc.) if the *use* of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced.

As noted, the greenhouses are machine-like in their function under the definition of the term machine propounded by the various witnesses at trial. However, the Court is not of the opinion that the greenhouse is a machine under the meaning of Treas.Reg. § 1.48–1(e)(i) such as to exclude the structures from being "non-buildings" under § 48. Rather, it is the second exception which prevents these greenhouse structures from being classified as buildings within the meaning of the statute. That is, these particular structures are so uniquely and specifically designed to provide the optimum atmospheric conditions conducive to the commercial growing of flowering plants, and are so designed to meet the specific needs of horticulture, that the greenhouses in question are not buildings under § 48 by virtue of the functional test

as contained in the regulation's second exception. The structures cease to be greenhouses when the function of creating an environment is terminated.

One factor which indicates that a structure is closely related to the use of the property it houses is the fact that the structure "could not be economically used for other purposes."[5] As found by this Court, these structures could *theoretically* be used for a multitude of alternative uses but *economically* and *practically* speaking, cannot be utilized at the present site without major renovations to render the structures safe and suitable for human activity or other productivity. There was opinion testimony as to the possible alternative uses to which these structures could be put: sewage treatment facilities, horticulture classes and other educational purposes such as rehabilitation and hobby classes. These alternatives are not economically feasible. No sewer lines exist in the near vicinity of this site which lies outside of St. Joseph. As for conversion to educational facilities, the students would be going to the site where the plants are being raised. The human activity would be brought to the structures containing the plants, rather than horticulture being brought to the classroom. These structures were not designed for classroom use or student occupancy. Conversion would not be economically practical. Just as a commercial brick kiln capable of firing thousands of bricks at one time would not be suitable for a ceramics class, so too a commercial greenhouse complex would not be economically suitable for educational, rehabilitation, or hobby classes.

These structures are more closely related to the structures cited in the regulation as non-buildings: brick kilns, coke ovens, silos, oil and gas storage tanks. This determina-

5. In its legal arguments and briefs, the government has often referred to *Endres Floral Co. v. U. S.*, 450 F.Supp. 16 (N.D.Ohio, 1977) in support of its argument that the greenhouse structures are buildings. The main distinguishing factor is that the greenhouse models used by Endres were structures having a standard live load of 15 lbs/sq. ft. and the Blue Ribbon model was "designed to be adaptable to a variety of

different uses." The manufacturer expressly advertised the model as suitable for purposes other than horticulture. Stuppy's catalog only offers the Rainbow series to the professional grower for the express purpose of greenhouse usage. This may be explained by the greater live load capacity of the Endres structure rendering it suitable for alternative functions.

tion of the relationship is made after examining the extent of human activity within the structures, for:

> The quantum of employee activity is, in our opinion, critical in determining whether the function of a given structure is principally, or only incidentally, to provide work space. *Yellow Freight,* 538 F.2d at 797, n. 11.

Much emphasis was placed by the government on the quantum of activity performed inside the greenhouse. The plaintiff readily admits that the numerous tasks involving the grooming and growing of the flowering plants are performed inside the greenhouses. However, once the specific task is performed the workers leave the structures and return to the headhouse which is the center of the range of facilities. It is the headhouse which has been modified to provide shelter for human activity and to provide work space. In fact, many of the required tasks can be performed inside the headhouse but, for convenience, the workers take the water and insecticide to the plants rather than transport the plants to the headhouse for treatment. As stated as a finding of fact by the Court, all of the human activity that does occur within the structures is directly related to the production of the commercially marketable flowering and foliage crops. The sole function of these structures is to provide optimum growing conditions for plants. The fact that human activity may also be performed in the controlled climate is one of convenient coincidence rather than by design.[6] The sheltering of human activity is only an incidental, not primary, function of these structures.

Accordingly, because these structures are not buildings under either the form or function tests, are primarily designed and utilized for the production of commercially marketable plants and not for the shelter of human activity, these structures are "section 38 property" and the plaintiff is enti-

tled to a refund of a portion of the taxes paid. Therefore, it is hereby

ORDERED that judgment be granted in favor of the plaintiff and against the defendant in the amount of $10,480 together with interest as provided by law.

---

**6.** In *Starr Farms, Inc. v. United States,* 447 F.Supp. 580 (W.D.Ark.1977), this same argument was rejected by the court in regard to structures housing chickens. Therein, the Hon. Paul X. Williams found a dual function of the structures: shelter for the chickens to produce eggs and shelter for the employees to gather the eggs and tend the chickens. Here the function is not dual, but primarily to produce a climatological condition for the plants.