**ENDRES FLORAL COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C75–1143.**

United States District Court, N. D. Ohio, E. D.

Nov. 18, 1977.

## MEMORANDUM OF OPINION

MANOS, District Judge.

This is an action for the refund of federal taxes of $19,480.00, plus interest as provided by law, paid pursuant to a self-assessment made by plaintiff when filing its 1973 federal income tax return. Jurisdiction is based upon 28 U.S.C. § 1346(a)(1) (1970). The sole question of law is whether the plaintiff's newly-constructed greenhouses are "buildings" within the meaning of section 48(a)(1)(B) of the Internal Revenue Code of 1954 so that the greenhouses do not qualify for the investment tax credit provided by section 38 of the Code.

## I.  FINDINGS OF FACT

Endres Floral Company[1] is an Ohio corporation engaged in the business of growing and selling cut roses principally on the wholesale market. Endres sells flowers throughout the year but its peak market periods come at certain holidays such as Valentine's Day, Easter, Mother's Day, and Christmas.

Endres' roses are grown in greenhouses which are principally located at Route 2, New Philadelphia, Ohio. At this location, Endres has 28 greenhouses. These greenhouses have been constructed at varying times over the years Endres has been in business. In 1973, Endres constructed four inter-connecting greenhouses which are the subject of this litigation.[2] The greenhouses form one rectangularly-shaped structure with a length of 422 feet and a width of 144 feet, having a total ground space of approximately 64,000 square feet.[3]

The greenhouses are of aluminum frame and bar construction. Each greenhouse has

Zolman Cavitch, Edward Kancler, Alan Doris, Cleveland, Ohio, for plaintiff.

Dennis M. Donohue, Justice Dept., Tax Div., Washington, D. C., for defendant.

---

1.  Hereinafter, "Endres."

2.  These greenhouses are joined together eave to eave forming one structure and are the type of greenhouse commonly referred to as the ridge and furrow type. Stipulation of the Parties 5. Unless otherwise indicated, references to "the greenhouses" in this Memorandum of Opinion are to the four greenhouse structures at issue.

3.  The greenhouses at issue are depreciable property with a useful life of more than eight years, and constitute tangible property used as an integral part of the production of cut roses. Stipulation 9. The total cost of the greenhouses is $286,157.24 including $65,752.49 for the climate control system in the greenhouses and $5,031.86 for the watering and fertilization system. Plaintiff's Exhibits 1, 2, 3, and 4; *see* Stipulation 10.

an A-frame roof supported by a series of traverse trusses which, in turn, are supported at both sides by aluminum posts set in concrete foundations. The roofs are approximately 10 feet high at the eaves and approximately 19 feet high at the peaks; the roof and the upper 7 feet of the greenhouse walls are made of glass sections 24 inches by 26 inches in dimension. The lower 3 feet of the walls are constructed of corrugated asbestos rock sheets. The greenhouses look like a building.

Doors are located midway along the longitudinal walls, one leading to the outside and one connecting the structure to a service building. Two doors are also located at each of the north and south ends of the structure.

Temperature and humidity in the greenhouses are regulated by a sophisticated climate control system. Whenever the internal temperature of the greenhouses falls below a predetermined level, electronically operated valves automatically open to provide steam heat through a system of thin pipes running along the perimeter of the structure.[4] This perimeter heat supplies 70 percent of the heat needed for these greenhouses. The remaining 30 percent of the heat required for these structures is provided by 32 gas-fired hot air unit heaters which blow hot air through a series of perforated polyethylene tubes strung above the plants.

The east side of the structure is banked with exhaust fans and the west side is banked with ventilators. Immediately next to these ventilators is an apparatus in which water is dripped slowly down wood-fiber pads. When the temperature in the greenhouses rises above a predetermined level, ventilators running along the side of the pads are automatically opened, exhaust fans are turned on, and air is drawn through the pads, cooled by evaporation, and then carried through the greenhouses thereby reducing the interior temperature of the structure. Cool air is also supplied by means of recirculating fans located at the north and south ends of the structure which blow cool outside air through the polyethylene tubes.

The greenhouses also have an automatic system for watering and fertilizing the rose plants. Controls located outside of the greenhouses automatically control the sprinkler and fertilization system.[5]

The interior of the greenhouse structure contains over 44,000 rose bushes planted directly into the soil comprising the greenhouse floor.[6] A cement walkway about four feet wide runs along the entire east side of the structure; two-feet-wide cement walkways also run along the north and south ends of the structure. The interior space of the structure is divided in half by a nonsupportive glass wall which serves to prevent the spread of disease among the plants and to facilitate the climate control in the greenhouses.

Endres' greenhouses, as equipped with the sophisticated climate control system, provide an artificial environment that permits the year-round growing of commercially marketable roses. As described, many of the requirements for growing roses were automatically satisfied by the Endres' equipment; other needs were attended to by Endres' employees.

Endres employed over 40 full-time employees and between 4 and 6 part-time employees in its total operations for the time period here at issue. Of these, approximately 24 full-time and all part-time employees were assigned to the Route 2 location. At that location, employees were individually assigned to the greenhouses by section, with generally one or two employees being assigned to each section. The four greenhouses here at issue were divided into two sections (north and south) with one

4. The steam for this heat is generated in a boiler located in a separate service building.

5. The sprinkler system is located at the base of each bed of roses. Fertilizer is mixed with water for the sprinkling system by an employee licensed for this job by the state. The mixing process takes place outside the structure.

6. The rose bushes were planted in 88 beds with approximately 510 bushes per bed.

employee assigned to the south section and two employees assigned to the north section.[7]

The rose bushes were initially planted by hand into the greenhouse floor. These plants are discarded and replaced with new plants approximately every eight to ten years. Prior to the planting of the roses in the beds, the soil in each bed was sterilized by steam carried by pipes which had been laid on the rose beds by the employees. When this process was completed, the pipes were removed and fertilizer and organic matter was added to the soil. After planting, these new plants were at times hand watered.

While growing, the rose stems are kept erect by wire fabric grids. The first grid is ordinarily installed about 18 inches above the soil, and each succeeding grid is placed at about fifteen-inch intervals above the first. Thus as the rose stems develop, they are guided, by hand if necessary, into upright columns formed by the grids.

The objective with newly-planted rose bushes is to develop several good diameter canes from the base of the plants. To achieve this requires "pinching" of the young plants. This early pinching is done by removing the tip of the shoot just above the second or third five-leaflet leaf as it is unfolding. This early pinch is called a "roll-out" pinch.

Pinching is also continually being done on the more mature rose bushes. Pinching of the bushes is done for two different reasons: one, to improve the growth of the plant, and two, to time the blossoms for the peak holiday periods. The employees utilized two different types of pinches: a hard pinch and a soft pinch. Soft pinches involve the employee removing just the flower bud, whereas hard pinches are made further down on the stem, generally leaving two five-leaflet leaves below the pinch. The type of pinch used varies depending upon the weather conditions and the time of year. Pinching to improve the size and quality of the roses is essential in developing a commercially marketable cut rose.[8]

Also, one or more times a year rose bushes are pruned back. Pruning is necessary to prevent the plants from getting too tall and also to improve the product. Endres uses two methods of pruning its rose bushes. One method is the direct cutback by which all the bushes in a particular area are cut off at a 24-inch height with an electric trimmer. The second method requires the employees to engage in a gradual and more selective cutback of the rose plants. This process is done by hand with a knife. In the greenhouses here at issue, Endres principally employs the gradual cutback method. It ordinarily takes one employee approximately two months to complete the gradual cutback in his or her assigned section.

The application of fertilizer is essential to the growth of Endres' rose bushes. Both liquid and dry fertilizer are applied to the rose bushes. In order to determine the proper fertilizer compound to use, Endres' employees routinely forward soil samples to horticultural laboratories for analysis. Any mineral deficiencies in the soil are shown in these tests. Liquid or organic fertilizers are then applied to correct the deficiency. Liquid fertilizer is fed to the plants by the automatic watering system. Organic fertilization in the form of corn cobs and dried blood is added to the soil by the employees. Lime is also spread by hand on the soil. The frequency of the use of organic fertilizers varies depending on the condition of the soil, weather conditions, and time of year, but such fertilizer is generally applied once or twice each year.

---

7. While the employees would initially attend to the care of the roses within their assigned section, they would occasionally assist employees in other sections.

8. Where pinching is made to time production to holidays, Endres' employees keep records as to the number of pinches made so that Endres can estimate the number of flowers it will have available for the holiday. It was estimated that for every three pinches, two flowers would be produced. One of Endres' employees testified that for the upcoming Christmas holiday, they had made 50,000 pinches.

The rose plants are carefully watched by the employees for signs of disease or pests.[9] Rose plants are particularly vulnerable to certain fungi such as mildew. Powdery mildew, a whitish powder in the leaves, stems, and petals, spread by air currents, is very common to roses. In the summer months, this disease is particularly troublesome, and employees have to spray the plants for this problem approximately every twelve to twenty days. Red spider mite is also a serious pest to the rose grower. It is necessary for Endres' employees to frequently spray the plants for this pest. When a rose bush, or a portion thereof, becomes badly infected with this insect, it is necessary for the employees to clean any cobwebs from the bush by hand, and then to prune any damaged part of the bush. Other common types of pests with which Endres is faced are aphids, thrips, and white flies.

Endres' employees use a hydraulic spray to control disease and pests. Employees attach a nozzle of a rubber hose to certain hook-ups variously interspersed in the greenhouses. The employee then directs the spray on the plants as he walks the length of each bed. The effectiveness of the spray application depends upon the thoroughness of the operator. Different spray techniques are used depending upon the pest or disease controlled. The frequency of spraying varies depending on the need, between once or twice per week and once every six weeks. It generally takes an employee from three to four hours to spray a particular section for powdery mildew. Without spraying, Endres would lose its entire crop.

The most time-consuming activity of the employees in the greenhouses is harvesting the roses. Roses are harvested seven days per week, twice per day in the morning and afternoon. The length of time spent in cutting varies depending on the time of year and size of crop. During peak crop periods, employees cut roses for up to four hours in the morning and up to two hours in the afternoon. During slack periods, the morning harvesting may be completed in one and one-half hours and the afternoon harvest in one hour. For each of the two sections of the greenhouse the harvesting of roses takes one employee about three hours per day on the average.

Rose harvesting requires considerable employee skill. In order to assure the highest possible price for the flower, the employee must cut the flower at a precise stage. For most of the plants grown in these greenhouses, this stage is when one or two of the outer petals just begin to unfurl. Further, since a principal factor in the pricing of roses is the length of the stem, it is necessary for the employee to cut the rose at the proper place on the stem. The place of this cutting varies depending on the time of year. In the fall and winter, roses are cut "up," leaving more leaves below the cut. In spring and summer, roses are cut "down," leaving fewer leaves below the cut. The employees move along the greenhouse aisles cutting the roses and placing them into buckets of water. These buckets are set in a cart which is rolled along the concrete walk and the cart is wheeled out of the greenhouses when full.

The greenhouses here at issue were manufactured by the Lord & Burnham Company. This particular model was called the Blue Ribbon greenhouse. This model is a prefabricated structure having a standard live load of fifteen pounds per square foot. The Blue Ribbon model is designed to be adaptable to a variety of different uses.[10]

---

9. For most plant disorders, the employees themselves can diagnose the problem. If the particular problem is unknown, plant samples are sent to horticultural laboratories for analysis.

10. Defendant's Exhibit G, an advertising brochure from Lord & Burnham describes the Blue Ribbon model greenhouses as follows:

This is America's top quality line of greenhouses for general commercial and industrial installations. It combines the strength and durability of all-aluminum with the most economical coverage possible through the use of standard structural parts, modern production line fabrication, and simplified erection techniques. . . . Due to the versatility and adaptability of its basic design and availabili-

At trial, Robert Burns, a professor of architecture and design at North Carolina State University, testified as an expert witness for the defendant. Burns stated that he recently visited lumber and brick kilns in North Carolina. He described the appearance and operation of the lumber kiln as follows:

The lumber kiln was approximately 20 to 24 feet wide, 80 to 100 feet long and 16 to 18 feet high. Its side walls were of solid brick construction. Its roof was built of metal framing and cement-asbestos panels. Three sets of steel tracks (railroad-type) ran lengthwise through the structure and three long sliding doors closed the two ends of the structure. Within, steam pipes were arranged between and over the three track beds. No electric lights, work benches, or other provisions were made for workers. The structure had the appearance of a building.

The process by which lumber was kiln-dried was the following: (1) a total of approximately 100,000 board feet of rough saw lumber was stacked on several shelved flat-bed carts outside the kiln; (2) the doors were slid open and the stacked lumber was pushed in by tractor-type vehicles filling the entire kiln; (3) the doors were closed and the lumber was steam-heated to 190 degrees F. for 72 hours; (4) the doors were opened at the far end of the kiln, the lumber-laden carts were pushed out and stacked under cover, ready for finishing or sale; and (5) the process began again for another batch of lumber.

The kiln operated much like a huge oven, and at no time did employees enter the kiln during the drying process. The temperature and humidity were monitored and controlled on the exterior. Employees had to wait 30 minutes or more at the end of the 72-hour drying cycle before they could even enter the kiln. Periodic routine maintenance was required for the interior and exterior of the structure and its heating equipment.

Burns described the appearance and operation of the brick kiln as follows:

The kiln was housed in a large metal frame structure. The kiln had the appearance of a long, relatively low and narrow tunnel. It was constructed of standard brick on the outside, fire brick on the inside, and measured 500 feet long by 12 feet wide, by 11 to 12 feet high. A single pair of tracks entered the kiln which had a single highly insulated automated door.

Carts of brick were delivered from a warming room to the kiln entrance automatically and one cart was introduced into the kiln each hour. Oil-fired jets on the kiln's interior were used to produce increasing levels of temperature as the bricks proceeded along the length of the kiln. The entire curing process within the kiln took 24 hours. This process removed all water from the bricks and formed them into their final condition.

The brick kiln was in continuous operation 24 hours-a-day, 360 days-a-year, with only a five-day shutdown each year for routine maintenance and cleaning of the interior floor jets and surfaces. At no other time did employees enter the kiln and all operations were totally automated and computer-controlled. There was no space for workers in the kiln when it was in operation—the bricks consuming virtually all floor space—and, of course, the heat was intolerable.

---

ty in a wide variety of sizes and styles, the Blue Ribbon line is also the favorite in public institutions, schools and colleges, agricultural stations, industrial research laboratories, and sewage treatment plants to enclose sludge beds.
Exhibit G at p. 10.
Exhibit E, another Lord & Burnham brochure, at p. 2 lists the following functions for the Blue Ribbon greenhouse: Life Science Laboratories, Growing Houses, Agricultural Exper-

iment Stations, Park Buildings, State and County Farms, Sewage Sludge Drying Beds, Hospital Hobby Greenhouses, Retirement Home Hobby Houses, Florist's Show and Display Houses, Residential Swimming Pool Covers. The list concludes with the statement, "Any model may be used for any purpose, but the above selections have been found to be most practical."
The Endres greenhouses are adaptable for some of these uses.

Endres timely filed its corporate income tax return for 1973. On that return, Endres took an investment credit in the amount of $348. On February 26, 1975, Endres filed an amended corporate income tax return claiming a refund of $16,264. On this return, Endres took an additional credit against its tax in the amount of $16,264 on the basis of the eligibility of the investment tax credit to the cost of the greenhouses here at issue. No notice of disallowance was sent by the Internal Revenue Services to Endres regarding this claim. On November 8, 1976, Endres filed a second amended corporate income tax return claiming a refund in the amount of $19,480 on the same basis. This claim for refund was denied by the Internal Revenue Service on March 8, 1977. Endres had instituted this suit for refund on March 8, 1975.

## II. CONCLUSIONS OF LAW

The investment credit provisions of 26 U.S.C. § 38 allow a credit which is an offset directly against income tax liability. The types of property which constitute a qualified investment are described as "section 38 property," which is defined in section 48 of the Code. Section 48 reads in pertinent part:

(a) Section 38 property.—

(1) *In general.*—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (*not including a building and its structural components*) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research facility used in connection with any of the activities referred to in clause (i), or

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities . . .. [emphasis added.]

In addition, the statute provides that section 38 property must be depreciable and have an estimated useful life of three or more years.

It is undisputed that the structures in issue are depreciable property, have a useful life in excess of eight years, and that they constitute "other tangible property," which property is used as an integral part of production, i. e., the production of cut flowers. The only dispute between the parties is whether the greenhouses are "buildings" within the meaning of section 48(a)(1)(B) of the Code. If they are buildings, the plaintiff is ineligible for the investment credit and the claimed refund must be denied.

A. *The General Definition of "Building"*

■ The legislative history underlying the investment credit provisions indicates that the term "building" was to be given its commonly accepted meaning. Both the House and Senate Committee Reports on the bill stated:

Building and structural components thereof are not eligible for the credit. The term "building" is to be given its *commonly accepted meaning,* that is, a structure or edifice enclosing a space within its walls, and usually covered by a roof. It is the basic structure of an improvement to land and the purpose of which is, for example, to provide shelter or housing or to provide working, office, display, or sales space. The term would include, for example, the basic structure used as a factory, office building, warehouse, theater, railway or bus station, gymnasium, or clubhouse. [emphasis added.] [11]

■ Section 38(b) of the Code directs the Commissioner to promulgate regulations

---

11. H. Rep. No. 1447, 87th Cong., 2d Sess., p. A18 (1962–3 Cum. Bull., p. 516); S. Rep. No. 1881, 87th Cong., 2d Sess., pp. 154–55 (1962–3 C. B. 857–59), U. S. Code Cong. & Admin. News 1962, pp. 3297, 3456.

necessary to implement the investment credit provisions. Pursuant to this authority, the Commissioner has also provided a definition of the term "building" in Treasury Regulation § 1.48–1(e)(1). The general definitional part of that regulation provides: "The term 'building' generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores." This regulation, conforms to the congressional understanding of the term "building" and follows Congress' intent that the term building be given its commonly accepted meaning.[12] *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 795–96 (8th Cir. 1976).

Accordingly, the clear intent of Congress, now expressed in Treasury Regulation § 1.48–1(e)(1), is to give the term "building" its ordinarily accepted meaning rather than some restrictive, technical meaning for purposes of the investment credit. Thus the congressional and regulatory test of whether or not a structure is a building for purposes of the investment credit is broad. It calls for a determination as to appearance and purpose of the structure in question. Visually, the structure need only enclose a space within its walls and usually be covered by a roof. The purpose for which the structure was erected can be extremely diffuse while still falling within the general definition of building. The purposes of a building set out in the legislative history and regulations (providing shelter or housing or providing working, office, display, or sales space) are comprehensive and even those purposes are merely illustrations. *See* text accompanying n.11, *supra,* and Treasury Regulation § 1.48–1(e)(1).

In terms of their physical appearance and purpose, Endres' greenhouses were "buildings" in the ordinary sense of the word. They had aluminum frames, concrete walkways, walls or glass and corrugated sheet material, and glass roofs all of which enclosed a volume of space.[13] The greenhouse gutter posts were set in concrete foundations. The greenhouses were constructed from commonly used building materials and the structures were permanent in nature. They had doors, vents, heating and cooling systems. Endres' employees regularly worked inside the structure, engaging in a broad range of activities related to the processing of commercially marketable roses. All of these characteristics are associated with "buildings" as that term is commonly understood. At trial both expert witnesses [14] testified that in their opinions the greenhouses at issue

---

12. Treasury Regulations must be sustained where reasonable and consistent with the underlying statute. *Commissioner of Internal Revenue v. South Texas Lumber Co.,* 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948); *United States v. Correll,* 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967). The regulation applicable to the instant case was not merely promulgated in accordance with the Commissioner's general grant of power to issue regulations but pursuant to a specific grant of power under § 38(b). Regulations issued pursuant to an express statutory authorization are legislative in character and, as, such, as binding upon a court as a statute if they are (a) within the granted power, (b) issued pursuant to a proper procedure, and (c) reasonable. *Kramertown Co. v. Commissioner of Internal Revenue,* 488 F.2d 728, 730 (5th Cir. 1974). This court accepts the definition given in the regulation.

13. While the principal ground space of the greenhouses was not composed of man-made flooring, this element is not an essential aspect of the definition of a building in its commonly accepted sense. *See Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 796 & n.9 (8th Cir. 1976) in which the structures there at issue did not have permanent walls yet were held to be buildings.

14. Dean Charles H. Kahn, Professor of Architecture and Dean of the School of Architecture at the University of Kansas, testified for the plaintiff. Professor Robert P. Burns, a professor of architecture and design at North Carolina State University, testified for the defendant.

would fall within the commonly accepted meaning of the term "building."[15]

The Endres greenhouses, therefore, are buildings under the general definition of the term.

### B. *Exceptions to the General Definition*

The Treasury Regulation specifically sets forth two exceptions to the general rule that all structures satisfying the appearance and purpose test are buildings. Endres contends that these exceptions are applicable to its greenhouses. The regulation provides that the term "building" does not include "(i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity [including production activity] if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced." Treas. Reg. § 1.48–1(e)(1).

#### 1. *The first exception: an item of machinery*

■ With respect to this exception, the court looks to whether or not these greenhouses simply function as essentially items of machinery or equipment. In other words, do the greenhouses constitute mere processing chambers. *See Sunnyside Nurseries v. Commissioner,* 59 T.C. 113, 121 (1972). Examples of building-like structures which fall within the first exception are brick kilns and lumber kilns,[16] and freezer structures used in the final processing of milk and ice cream products.[17] The significant distinction between those structures and the greenhouses here at issue is that considerably more human activity is performed within the greenhouse structures.[18] In cases in which structures have been held to be essentially machinery or equipment, the minimal amount of human activity has been emphasized.[19] By contrast, there is more than a minimal amount of human activity performed within the Endres' greenhouses and this activity is essential to the care of the plants and the production of Endres' ultimate product—cut roses.

The employees' work of pinching, pruning, fertilizing, spraying, and cutting the roses took place on a regular basis in the greenhouses. The growing of the rose plants required a considerable degree of skill and knowledge on the part of the employees. While the greenhouses provide a controlled environment for plant growth, they did not simply operate as processing chambers. *See Sunnyside Nurseries v. Commissioner,* 59 T.C. 113, 121 (1972). Because of the amount of human activity in the greenhouses, the structures fail to qualify as essentially items of machinery or equipment within the meaning of the first regulatory exception.[20]

#### 2. *The second exception: structure closely related to the property it houses*

■ The second exception to the general definition excludes structures when the use

---

**15.** This court is aware of the holding in *Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915 (9th Cir. 1974), that a greenhouse was eligible for the investment credit. For the reasons set out in *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 797–98 (8th Cir. 1976), this court declines to follow that holding. *See Sunnyside Nurseries v. Commissioner,* 59 T.C. 113 (1972) (Raum, J.); *Satrum v. Commissioner,* 62 T.C. 413, 418–20 (1974) (dissenting opinions). The court notes Rev. Rul. 77–363 (Oct. 11, 1977 Bull. No. 1977–41).

**16.** *See* Rev. Rul. 69–557, 1969–2 C.B. 3.

**17.** *See* Rev. Rul. 71–489, 1971–2 C.B. 64.

**18.** *See* pp. 9–10, *supra,* this Memorandum.

**19.** *E. g.* "No work other than automatic processes is performed within the structures. The structures are entered by working personnel only to make repairs or adjustments to the equipment or machinery housed in the structure." Rev. Rul. 69–557, 1969–2 C.B. 3, 4. "Because of the extremely low temperatures maintained within the structure, stacking and unstacking are the only work activities that take place inside." Rev. Rul. 71–489, 1971–2 C.B. 64, 65.

**20.** As to the importance of the amount of human activity within the structure as it relates to whether the structure qualifies as an item of machinery, *see Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 797 n.11 (8th Cir. 1976).

of the structure is so closely related to the use of property used for production that the structure clearly can be expected to be replaced when the property it housed is replaced. The regulation sets forth two factors which indicate that a structure qualifies for the second exception. These factors are: (1) the fact that the structure is specially designed to provide for the stress and other demands of such property, and (2) the fact that the structure could not be economically used for other purposes. Treas. Reg. § 1.48–1(e)(1).

In regard to factor (1), *supra,* it is undisputed that the greenhouses act in conjunction with the sophisticated temperature, ventilation, and fertilization systems to provide a controlled environment for the growing of roses. However, this greenhouse is not specially designed to accommodate these systems. Greenhouses have provided controlled environments for plants prior to the development of these elaborate systems. With some inexpensive modifications to the greenhouses in issue, they could continue to provide a climate for plant growing without the sophisticated equipment.[21] While the greenhouses and the automated systems were mutually beneficial, the greenhouses here in question were not designed to provide for the stress and demands of the automated equipment.[22]

In regard to whether these greenhouses can be economically adapted to another use, the defendant offered numerous Lord & Burnham brochures which advertise multiple uses for the Blue Ribbon type greenhouses.[23] The Endres' greenhouses, according to the testimony of expert witness Burns, are not necessarily limited to the use which they now serve, *i. e.* the production of cut flowers.

When reinstating the investment tax credit in 1971, the Senate Finance Committee, in its report to the Senate on this legislation, offered an example of the type of structure which would qualify for this exception. This Report [24] states:

> One example of a type of structure closely related to the product it houses which was called to the attention of the committee is a unitary system for raising hogs which includes automatic feed systems, special [30] airflow units, slatted flooring, pens and partitions. The structure which can be added to, according to the number of hogs raised, *is no more than a cover and way of tying together the specially designed pens, automatic feed systems, etc.* There is no other practical use for the structure and it can, therefore, be expected to be used only so long as the equipment it houses is used. Such a structure would be eligible for the investment credit. [Emphasis added]

This example indicates that the second exception is intended to apply only to structures which are no more than "skin coverings" for the various machinery and equipment which they house.[25] The Endres

---

**21.** For example, Eugene Endres testified that if the pad and fan ventilation system was removed, the plant would be threatened with overheating. However, there was testimony that this problem could be easily alleviated by installing ridge vents. *See* Defendant's Exhibit K, pp. 2–8.

**22.** According to the language of the regulation, which accurately reflects the intent of Congress, the court must scrutinize the relation between the structure and the equipment it houses rather than the relation between the structure and the product (roses). The greenhouses are closely related to the production of commercially marketable roses, but they were not specially designed for this equipment.

**23.** *See* note 10, *supra.* This court accepts the plaintiff's contention that the proper inquiry on this issue must be toward whether these particular greenhouses can be economically adapted to other uses. The expert testimony on this issue was in conflict. The defendants expert witness, Burns, testified from his experience that the Endres greenhouses were suitable for other uses. Though not discounting the testimony of Dr. Kahn to the contrary, the court finds that the Endres greenhouses may be suitable for other purposes.

**24.** S. Rep. No. 92–437, 92nd Cong., 1st Sess., pp. 29–30 (1972–1 Cum. Bull. 575–76), U. S. Code Cong. & Admin.News 1971, pp. 1825, 1936–1937.

**25.** *See Satrum v. Commissioner,* 62 T.C. 413, 419 n.2 (1974) (dissenting opinion).

greenhouses were not designed merely to cover the rose growing equipment. Greenhouses can and do function separately from such elaborate automatic systems.[26]

To qualify for the second exception, it must be clear that the greenhouses can be expected to be replaced when the property used as an integral part of the production of roses is replaced. This is not clear. The greenhouse could continue to function for the production of plants and for other purposes after the sophisticated rose-producing equipment was removed.

Thus, these greenhouses do not qualify for the second regulatory exception and the defendant is therefore entitled to judgment on the issue of whether the greenhouses are buildings within the meaning of Treasury Regulation § 1.48–1(e)(1).

### C. *The Equipment in the Building*

The $65,752 cost for the climate control system which operates in the Endres greenhouses qualifies for the investment credit. The climate control system is depreciable property with a useful life of eight or more years and constitutes other tangible property which is used as an integral part of the production activity.

The climate control system is not a building or a structural component of a building. Treasury Regulation § 1.48–1(e)(2) states that "the term 'structural component' does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for . . . the processing of material or foodstuffs." The climate control system is designed to meet the temperature and humidity requirements for the processing of cut roses, and therefore the cost of the system is eligible for the investment credit.

In the trial brief for the defendant, the government stated: ". . . although evidence will show that the greenhouses herein do house some elaborate and sophis-

ticated equipment (which equipment itself would appear to qualify for the credit), such as temperature control and fertilizing systems . . . ." Trial Brief for the Defendant at 23.

The plaintiff is entitled to a judgment in the amount of $4,602.64 plus interest as provided by law and costs as provided by law.

---

26. It appears from the language of the Senate Report, read in conjunction with the applicable Treasury Regulation, that the modular hog rais- ing facilities would be virtually useless without the related equipment.