JERROLD L. MCKENZIE AND SALLY A. MCKENZIE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 670–82.    Filed November 27, 1985.

---

*John P. Raynor*, for the petitioners.
*Robert L. Archambault*, for the respondent.

PARKER, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes in the amounts of $1,510 and $890 for the taxable years 1973 and 1976, respectively. Respondent also denied petitioners' refund claim asserted in amended returns filed for 1973 and 1976, and petitioners now assert on overpayment of taxes in that regard. On their original and amended returns, petitioners claimed investment tax credits, which give rise to various issues under the statute and regulations governing such credits.

The issues for decision are as follows:

1. Whether petitioners' dog and cat kennel is a single purpose agricultural or horticultural structure within the meaning of section 48(a)(1)(D).[1] Specifically, the issue is whether the kennel qualifies as a single purpose livestock structure under section 48(p)(2).

2. If not, whether the boarding area of that kennel is "tangible personal property" as that term is used in section 48(a)(1)(A). That in turn involves issues under the pertinent regulations as to whether or not the boarding area is an inherently permanent structure and whether or not the boarding area is an item of machinery or equipment.

3. Whether petitioners' horse barn is a single purpose agricultural or horticultural structure within the meaning of section 48(a)(1)(D). That involves issues as to whether the structure was specifically designed, constructed, and used as a single purpose livestock structure under section 48(p)(2), and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.

whether horses are livestock within the meaning of section 48(p)(2) and section 1.48–10(b)(3), Income Tax Regs.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The written and oral stipulations of facts and the exhibits attached to the written stipulation are incorporated herein by this reference.

Petitioners Jerrold L. McKenzie and Sally A. McKenzie, husband and wife, resided at 12104 Capehart Road, Papillion, Nebraska, at the time they filed their petition in this case. Petitioners filed 1973 and 1976 joint Federal income tax returns (Forms 1040) and amended 1973 and 1976 returns (Forms 1040X) with the Internal Revenue Service Center in Ogden, Utah.

## I. The Kennel Facility

Pursuant to an Omaha Board of Realtors Uniform Purchase Agreement dated February 17, 1976, petitioner Jerrold L. McKenzie purchased 11.8 acres of land with improvements thereon, located at 12104 Capehart Road, Papillion, Nebraska. The total purchase price for the property was $100,000. Improvements on the property included a residence, a dog and cat kennel (the kennel facility), and a small shed. The uniform purchase agreement does not contain any allocation of the $100,000 purchase price between the land and the improvements, or among the various improvements. The parties stipulated that $24,000 of the $100,000 purchase price is allocable to the kennel facility.[2]

The kennel facility constitutes real property under State law. The kennel facility is principally a concrete and cinderblock structure enclosing approximately 1,350 square feet. The

[2]Petitioners offered the uniform purchase agreement into evidence to show that it contained no allocation of the purchase price to the kennel facility and that the stipulated cost allocation was based on respondent's acceptance of petitioner's allocation. Petitioners suggested that this would lend some credibility to Jerrold L. McKenzie's testimony regarding the allocation of costs among various parts of the kennel facility. See note 5 and accompanying text, *infra*. Respondent objected to the admission of the uniform purchase agreement into evidence because it does not in any way suggest a proper allocation of the purchase price between the land and improvements, among the various improvements, or among various parts of the kennel facility. The document was admitted into evidence with the understanding that it does not contain any allocation of the total purchase price. See Rule 41(b)(2); notes 5, 8, and 23, and accompanying text, *infra*.

walls are approximately 8 feet tall and are imbedded in a concrete foundation. It is a permanent structure fixed to the ground with a foundation. The facility could not be moved without destruction of the property. It is basically a facility for temporarily boarding pet dogs and cats while their owners are absent. Petitioners have never used the kennel facility for any other purpose.

The kennel facility consists of two principal areas, the "front structure" and the "boarding structure." These two areas would be separate structures if they did not share a common wall. They have separate roofs attached to their respective walls. The front structure measures 30.5 feet in width by 15.5 feet in depth, or approximately 473 square feet. Just inside the front door to the front structure are the reception and office areas. The reception and office areas are separated by an "L" shaped counter that encloses the office area. When a customer comes in to leave his pet, he fills out the necessary paperwork on the front part of the counter. Such paperwork includes a general release form and an information sheet on which the customer states, inter alia, the pet's food and medication requirements, its veterinarian, and its anticipated length of stay. Petitioners prepare the food to be served to the boarded pets on the side part of the counter. Petitioners also use the top of the counter to store the individual medications required by the boarded animals.

To the right of the counter and the reception area is a food storage area. During 1976, petitioners used this area to store large quantities of dog food. They bought large quantities of dog food at a wholesale rate, and then sold much of it to their customers. This enabled petitioners to reduce their cost of feeding the dogs they boarded. These sales took place in the reception area. Petitioners no longer purchase and store large quantities of dog food. They now use the food storage area to store smaller quantities of dog food and as a place to put temporary cages to keep animals when they have an overflow of animals to be boarded. Petitioners intend to install between 5 and 10 permanent cat cages in the food storage area.

To the left of the reception and office areas is a separate room known as the cat room. Cages used to board cats are located in the cat room. Two or three times a day petitioners clean these cages and the litter boxes in them, and change the

cats' water. Petitioners feed the cats twice a day. A bathtub raised to waist level is also located in the cat room. Petitioners bathe boarded animals in the tub. An animal is bathed at its owner's request, if it gets extremely dirty, and/or before it is returned to its owner. Petitioners also use the tub to wash the dishes used to feed the boarded animals. Petitioners have never used the cat room for any other purpose. There is also a small bathroom in the cat room for petitioners' use.

Petitioners board dogs in the rear part of the kennel facility (the boarding structure). The boarding structure is 60 feet long and approximately 14.5 feet wide. It encompasses approximately 877 square feet.[3] A door in the wall common to the front structure and the boarding structure opens from the office area directly into the boarding structure. A concrete aisle approximately 4 feet in width runs down the center of the boarding structure from the office door to the far end of the boarding structure. The aisle provides access to 37 individual dog pens (the inside runs) that run down both long walls of the boarding structure. Each inside run is 4 feet long (measuring from the outer wall of the boarding structure in towards the center aisle). The inside runs vary from 2½ to 4 feet in width.[4]

---

[3]The parties stipulated that the entire kennel facility measures approximately 1,350 square feet. According to a floor plan admitted into evidence, the front structure measures 30.5 feet by 15.5 feet. These measurements yield 472.75 or approximately 473 square feet. The floor plan also clearly shows that the boarding structure is 60 feet in length. It does not, however, disclose the exact width of the structure. Two different estimates of the boarding structure's width can be made using other measurements provided by the floor plan and Mr. McKenzie's testimony. The floor plan shows that a fence surrounds the boarding structure. The length of the fence running parallel with the end of the boarding structure is 42 feet. The distance between the long sides of the structure and the fences running parallel with them is 14 feet on each side. These figures produce a 14-foot estimate of the boarding structure's width (42-foot end fence length, less 2 times the 14-foot distances between the long side fences and the long sides of the boarding structure, equals 14). However, dog pens that line the inside of the long walls of the boarding structure are 4 feet deep. A center aisle that runs down the middle of the boarding structure, thus separating the pens on either side, is approximately 4 feet wide. Adding these measurements, the width of the boarding structure is estimated to be 12 feet (2 times 4-foot pen depths on either side, plus 4-foot width of the aisle, equals 12). This estimate does not take into account the width of gutters that run along either side of the center aisle in front of the inside pens. Respondent requested that we find as a fact that the boarding area measured 60 feet long by 12 feet wide. Petitioners requested that we find that the boarding structure measures approximately 877 square feet. To give effect to the parties' stipulation that the entire kennel facility measures approximately 1,350 square feet, we must find that the boarding structure measures approximately 877 square feet (1,350 less 473 (square footage of the front structure) equals 877). Sixty feet times the first estimate above of 14 feet equals 840 square feet. Sixty feet times the second estimate above of 12 feet equals 720 square feet. Sixty feet times 14.5 feet equals 870 square feet. Thus, we find as a fact that the boarding structure is *approximately* 14.5 feet wide and contains *approximately* 877 square feet. The 877 square feet does not include the outside runs for each inside pen.

[4]The parties so stipulated. However, according to the floor plan of the boarding structure, at least three of the inside runs are double runs 5 feet wide.

Each inside run is separated from the runs on either side of it by a concrete wall that is 4 feet tall. The top of each inside run is enclosed with chain-link fencing. The front of each inside run (i.e., the side facing the center aisle) consists of a chain-link fence gate.

Gutters run the length of the boarding structure on either side of the center aisle, in front of each row of inside runs. The gutters run into large drains at the south end of the boarding structure (the end adjoining the front structure). The concrete floors of the inside runs slope to the center of the boarding structure so that water runs into the gutters and then to the drains. The center aisle is crowned (i.e., higher in the middle than on the sides) so that water on it also runs into the gutters.

The boarding structure is heated by overhead heaters and cooled with air-conditioning for animal comfort. Additionally, radiant floor heaters are embedded in the concrete floors of the inside runs so that the concrete floors are not too cold for the animals to lie or sleep on. The boarding structure is also fully equipped with plumbing and electricity.

A dog in an inside run can gain access to a corresponding pen outside the boarding structure (an outside run) through a 12-inch by 17-inch opening or doorway in the wall of the boarding structure that forms the back of the inside run. This opening is usually covered by a rubber flap so that a dog can generally go in or out as it pleases. However, the doorway can also be closed by a metal guillotine-type door. A cable that extends out to the center aisle is attached to the door. Thus, a worker standing in the center aisle can open the doorway by pulling on the cable and raising the door straight up along its tracks, or close the doorway by releasing the cable and lowering the door.

The outside runs are 8 feet long (measuring from the wall of the boarding structure out) and are generally the same width as the corresponding inside run. The sides and top of each outside run consist of chain-link fencing. The front of each outside run is a chain-link-fence gate. On either side of the boarding structure, a gutter the length of the structure runs in front of the row of outside runs. These gutters run into drains at the south end of the structure. The concrete floors of the outside runs slope away from the boarding structure so that water runs into the outside gutters. The boarding structure is

completely surrounded by a concrete sidewalk and a 6-foot-tall chain-link fence. The posts of this chain-link fence are embedded in concrete.

The floors of the inside and outside runs are sloped, and the center aisle in the boarding structure is crowned to permit easy removal of animal waste material. When the runs are washed, waste material runs into the gutters and then into the drains at the south end of the boarding structure. The center aisle of the boarding structure allows petitioners access to the inside runs so that they can put dogs in and take dogs out of the runs. It also allows petitioners to water and feed the animals in the runs. The guillotine-type door in the doorway between each inside and outside run keeps the dog in the inside run while the outside run is being cleaned, and vice versa. It also keeps dogs inside during inclement weather. The sidewalk surrounding the boarding structure serves as a backside to the gutters that run in front of the outside runs. If the sidewalk were not there, waste material would accumulate in the area it covers because waste material frequently washes up out of the gutters and onto the sidewalk when the outside runs are cleaned. The sidewalk also provides an exercise area for the dogs that can be easily cleaned. Without the sidewalk and gutters, waste material left by dogs during their exercise would be difficult to completely remove.

Because the dogs and cats petitioners board are in such close quarters, it is easy for diseases and parasites to quickly spread among them. When an outbreak of a disease or parasites among the animals occurs, petitioners must completely disinfect the entire boarding structure. To do that, petitioners must stop taking animals about a month in advance so that there are no animals in the structure when it is disinfected. Petitioners have had two outbreaks of parainfluenza among boarded dogs. Such outbreaks and the shutdowns for disinfecting that follow can be very detrimental to petitioners' kennel business. Consequently, the expedient removal of waste material and the maintenance of sanitary conditions are of utmost importance to petitioners' kennel operations. They wash each run, inside and outside, with water each day, weather permitting. After a dog is picked up by its owner, petitioners wash the run it occupied with water. They then clean the run with a

disinfectant soap and rinse it with water again. Finally, they spray the run with a disinfectant.

The chain-link fence surrounding the boarding structure is there primarily for security purposes. It prevents a dog that is being exercised outside of its run or that somehow gets out of its run from escaping from the kennel facility grounds. It also keeps out people who do not belong on the grounds so that they cannot steal the dogs or be injured by the boarded animals.

Petitioners have never used the kennel facility for any purpose other than boarding animals. The facility could not be economically used for any other purpose.

In 1980, petitioner Jerrold L. McKenzie investigated the possibility of expanding the boarding structure and adding more runs. He has not expanded the structure because it is cost prohibitive. In making the investigation, he determined that the cost of replacing the chain-link fencing throughout and surrounding the structure would be $13,000. Without any explanation as to the nature of his investigation or as to his methodology, Mr. McKenzie concluded he would allocate one-third of the $24,000 cost allocated to the entire kennel facility (by the parties' stipulation), or $8,000, to such fencing.[5] He further concluded he would allocate 75 percent of the $24,000 cost allocated to the kennel facility, or $18,000, to the boarding structure (including the fencing). See note 5. There is no competent, probative evidence to support these estimates.

## II. The Horse Barn

During November of 1976, petitioners constructed a horse barn on their Capehart Road property. The construction was completed by the first of December. The horse barn is a clear span metal structure measuring 44 feet by 100 feet. Petitioners spent $12,204 to construct the horse barn.

---

[5]The Court admitted Mr. McKenzie's testimony in this regard over a number of objections raised by respondent. Respondent raised a continuing objection to any testimony regarding a cost allocation among parts of the kennel facility because he thought that such an allocation was not an issue properly before the Court. See Rule 41(b)(2); note 8, *infra*. Respondent also objected to such testimony because he thought that the cost of replacing existing fencing with new fencing in a year subsequent to the taxable years in issue is irrelevant in determining the proper allocation of the actual cost of the kennel facility among its components, especially when the facility was purchased used. The Court agrees with respondent that such replacement costs are irrelevant. Moreover, there is nothing in the record to support Mr. McKenzie's testimony except his own ipse dixit to which the Court accords little weight. These figures appear to have been plucked out of thin air and are entitled to about the same weight.

The horse barn is a "Lester" general purpose design building. In constructing the barn, petitioners made a number of alterations to the Lester design. Petitioners added a 4-foot overhang to the southern end of the roof so that they can walk to the barn or around the barn when it is raining without getting wet. Petitioners put eight windows in the barn to provide adequate ventilation. They also made the walls 12 feet tall (which is higher than the Lester design) so that a person can sit on a horse inside the barn and not hit his head on the rafters. After petitioners initially built the horse barn, they added two additional doors to the east side to allow horses to enter and exit.

However, during 1976 petitioners made no interior improvements to the barn, and its interior was just a big open space. In inclement weather, they used the barn to ride and exercise the five Arabian horses they owned at that time. They also kept the horses in the barn for short periods of time during extremely bad weather. In the spring of 1977, petitioners started making a series of improvements inside the barn. First, they put in three permanent horse stalls along the east wall at the south end of the barn. Then they built three stalls along the west wall directly opposite the first three stalls. Next, petitioners installed hay storage areas up above the first six stalls. At this point, the stalls, a washroom, and a tackroom occupied the southern two-fifths of the barn. The remaining three-fifths of the interior was an open space used for exercising horses. The floor of this open space was filled with fill sand for soft footing. The floor in the other area was just dirt, except that sawdust was used as bedding in the stalls.[6] Subsequently, petitioners increased the number of horses they owned, so they had to put in more stalls. First, they added two more permanent stalls. Then, they put in four portable metal stalls. They also had one temporary stall in the barn. Petitioners have also increased their hay storage space. Because of the additional stalls, petitioners now have to exercise their horses in the aisleway separating the two rows of stalls.

Petitioners also use areas in the barn for grain and sawdust storage. Petitioners intend to build a wash area for washing and grooming horses where they now store grain. They also

---

[6]The record does not indicate what the floor was made of during 1976, before the stalls were put in.

hope to build a veterinarian service area with a concrete floor, central drain, and heating system. Finally, they intend to install a tackroom for saddle, equipment, and medicine storage where the temporary stall is now located. Petitioners erected the horse barn intending to eventually make all of these improvements. They have made the improvements as they could afford them.

Petitioners have never used the horse barn for anything other than housing, raising, exercising, and caring for the Arabian horses they breed, raise, show, and sell. Petitioners do not store any equipment in the barn. All of the human activity that occurs in the barn relates to the feeding, cleaning, bathing, breeding, and general care of petitioners' horses. The horse barn could economically be adapted to other uses by merely removing the stalls and other fixtures petitioners have put in.

On the Form 3468 (Computation of Investment Credit) attached to their 1976 return, petitioners claimed a $2,590 investment credit. Of that amount, $2,400 was attributable to petitioners' investment in the kennel facility. Petitioners applied $890 of the credit claimed for the kennel facility against their 1976 income tax liability and applied the remaining $1,510 as an investment credit carryback against their 1973 income tax liability. On the Schedule F (Farm Income and Expenses) attached to their 1976 return, petitioners reported gross receipts in the amount of $5,204 from dogfood sales. On part III (Depreciation) of the Schedule F, petitioners claimed a depreciation expense on the kennel facility in the amount of $600. That amount was calculated using the full $24,000 cost basis of the facility, with no allocation between land and improvements thereon. No other assets related to the kennel facility appear on the depreciation schedule. For depreciation purposes, petitioners did not allocate the facility's basis to its various components.

On or about July 31, 1979, petitioners filed amended returns for 1973 and 1976. On the amended 1976 return petitioners claimed an additional investment credit in the amount of $1,220 for their investment in the horse barn. On the amended 1973 return, petitioners claimed a refund in the amount of $532 attributable to a carryback of the investment credit claimed on the horse barn.

By a statutory notice of deficiency dated October 15, 1981, respondent disallowed the $2,400 investment credit and resulting carryback petitioners claimed for the kennel facility. Respondent also disallowed the $1,220 investment credit and resulting carryback petitioners claimed for the horse barn. Petitioners challenge those disallowances and claim an overpayment of taxes for 1973.

## OPINION

During the taxable year 1976, section 38 allowed a credit against Federal income taxes for qualified investment in section 38 property.[7] Section 48(a) defined the term "section 38 property." As amended by section 314 of the Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2763, 2827–2828, 1978–3 C.B. (Vol. 1) 61–62, which amendment was made applicable to taxable years ending after *August 15, 1971*, section 48(a) defined section 38 property as follows:

SEC. 48(a). SECTION 38 PROPERTY.—
(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—
(A) *tangible personal property*, or
(B) other tangible property (not including a building and its structural components) but only if such property—
(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

\* \* \* \* \* \* \*

(D) *single purpose agricultural or horticultural structures*; or

\* \* \* \* \* \* \*

---

[7]During the taxable year in question, sec. 38 provided as follows:

SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

The substantive rules for computing the credit were in secs. 46 through 50 (subpart B). Sec. 38 and secs. 46 through 50 were substantially reorganized and revamped by various sections of the Tax Reform Act of 1984, Division A of the Deficit Reduction Act of 1984, Pub. L. 98–369, 98 Stat. 494, 1984–3 C.B. (Vol. 1) 2, generally effective for taxable years beginning after Dec. 31, 1983, and for carrybacks from such years.

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.
[Emphasis added.]

Section 314 of the Revenue Act of 1978, *supra*, also added section 48(p) to the Code, which provides as follows:

SEC. 48(p). SINGLE PURPOSE AGRICULTURAL OR HORTICULTURAL STRUC-TURE DEFINED.—For purposes of this section—
(1) IN GENERAL.—The term "single purpose agricultural or horticultural structure" means—
(A) a single purpose livestock structure, and
(B) a single purpose horticultural structure.
(2) SINGLE PURPOSE LIVESTOCK STRUCTURE.—The term "single purpose livestock structure" means any enclosure or structure specifically de-signed, constructed, and used—
(A) for housing, raising, and feeding a particular type of livestock and their produce, and
(B) for housing the equipment (including any replacements) necessary for the housing, raising, and feeding referred to in subparagraph (A).

In their petition to this Court, petitioners assert that both the kennel facility and the horse barn are single purpose livestock structures within the meaning of section 48(p)(2). Pursuant to the Court's leave, petitioners also amended their petition to include their claim that the kennel facility is a structure which is essentially an item of machinery or equip-ment within the meaning of section 1.48–1(e)(1), Income Tax Regs., and therefore section 38 property. At trial and on brief, petitioners concede that the front part of the kennel facility (the front structure) is a building and therefore does not qualify as section 38 property unless the entire kennel facility is a single purpose livestock structure. They contend, however, that if the kennel facility is not a single purpose livestock structure, the back part of the facility (the boarding structure) is nevertheless section 38 property because it is a structure which is essentially an item of machinery or equipment within the meaning of section 1.48–1(e)(1), Income Tax Regs.[8] Peti-

---

[8]At trial, respondent objected to petitioner's testimony regarding a cost allocation among various parts of the kennel facility because he thought that the issue of whether only a part of the kennel facility qualifies as sec. 38 property was not an issue properly before the Court. See note 5 and accompanying text, *supra*. The Court allowed such testimony under Rule 41(b)(2). Petitioners' amendment to the petition was sufficient to raise the issue. Moreover, because of our resolution of this issue, our consideration of it has not prejudiced respondent. See Rule 41(b)(2).

tioners seem to assume that the "machinery or equipment" argument will automatically bring them within section 48(a)(1)(A)—tangible personal property—and thus qualify the boarding structure as section 38 property. We note that petitioners do not argue, and properly so, that the kennel facility or any portion thereof qualifies as "other tangible property" within the meaning of section 48(a)(1)(B). That provision is clearly tied to specific types of activities that are not involved in this case. We will discuss each contention in turn.

## I. The Kennel Facility as a Single Purpose Livestock Structure

Section 48(p)(2) defines a single purpose livestock structure as an enclosure or structure specifically designed, constructed, and used for housing, raising, and feeding a particular type of livestock and their produce and for housing any related equipment. Petitioners argue that the kennel facility is a single purpose livestock structure within the meaning of section 48(p)(2) because it was specifically designed, constructed, and used to temporarily board household pets. They say that temporary boarding constitutes "housing" within the meaning of section 48(p)(2)(A). Petitioners support this argument by contending that under section 1.48–10(b)(2)(i), Income Tax Regs.,[9] a single purpose livestock structure may be used for any one of the three activities listed in section 48(p)(2)(A) (i.e., housing, raising, or feeding). Petitioners also contend that household pets are livestock for purposes of section 48(p).

Respondent disagrees on both counts. He argues that household pets are not livestock. He further argues that temporarily

---

[9]In pertinent part, sec. 1.48–10(b)(2), Income Tax Regs., provides as follows:

(2) *Permissible purposes.* The following are the only permissible purposes for a single purpose agricultural structure:

(i) Housing, raising, and feeding a particular type of livestock and, at the taxpayer's option, its produce. The term "housing, raising, and feeding" includes the full range of livestock breeding and raising activities, including ancillary post-production activities (as defined in paragraph (f) of this section). *Thus, for example, use of a structure for breeding livestock, or for producing eggs or livestock, is permitted.* * * * [Emphasis added.]

Petitioners actually cited to the Court sec. 1.48–10(*d*)(2)(i), Income Tax Regs. for this proposition, but we assume they intended section 1.48–10(*b*)(2)(i). Sec. 1.48–10(d), Income Tax Regs., as finally adopted, T.D. 7900, 1983–2 C.B. 18, 22, and as originally proposed, LR-88–79, 46 Fed. Reg. 7397 (Jan. 23, 1981), 1981–1 C.B. 746, 749, defines the phrase "specifically designed and constructed." It has no subsections.

boarding household pets does not constitute "housing, raising, and feeding a particular type of livestock" within the meaning of section 48(p)(2) and section 1.48–10(b)(2)(i), Income Tax Regs. Respondent interprets the "housing, raising, and feeding a particular type of livestock" language of the statute and regulation as requiring that a structure be used in agricultural or food production before it can qualify as a single purpose livestock structure. Petitioners suggest that such an interpretation directly conflicts with the legislative history of section 48(p).

Petitioners acknowledge that the only cases addressing the qualification of a structure as a single purpose livestock structure have involved structures used in agricultural or food production. See *Lesher v. Commissioner*, 73 T.C. 340 (1979), affd. per curiam 638 F. 2d 64 (8th Cir. 1981) (cattle feeding structure); *Berg v. Commissioner*, T.C. Memo. 1979–58 (hog farrowing structure). Moreover, a leading commentator describes qualifying structures as those used in agricultural or food production. See 5 J. Mertens, Law of Federal Income Taxation, secs. 32A.14 and 32A.19h, at 113, 154 (1980 rev.). For a detailed analysis of the legislative history of sections 48(a)(1)(D) and 48(p), see Solomon and Luchs, " . . . And This Little Piggy Went to Congress: The Revenue Act of 1978 and the Investment Tax Credit for Single-Purpose Agricultural and Horticultural Structures," 33 Southwestern L. J. 663 (1979–1980). Petitioners do not, and we think cannot, point to any part of the legislative history of section 48(p) that supports their position.

As originally adopted by the House of Representatives, H.R. 13511, 95th Cong., 2d Sess. (Aug. 10, 1978), which became the Revenue Act of 1978, *supra*, contained no provision dealing with investment credit for single purpose livestock structures. H. Rept. 95–1800 (1978), 1978–3 C.B. (Vol. 1) 521, 560.[10] The Senate amended H.R. 13511, *supra*, to make specifically eligible for the investment credit those structures, including poultry and livestock structures and greenhouses, which are specifically designed, constructed, and used for single purpose

---

[10]Although numbered as a House report, this report was actually submitted by the Committee of the Conference.

food and plant production.[11] H. Rept. 95–1800, *supra*, 1978–3 C.B. (Vol. 1) at 561. Prior to the conference agreement on H.R. 13511, the House of Representatives passed H.R. 12846, 95th Cong., 2d Sess. (Oct. 13, 1978), which provided that a poultry or hog structure was to qualify for the investment credit if, inter alia, it was specifically designed and constructed for the housing, raising, and feeding of poultry or hogs, and their produce.[12] H. Rept. 95–1761, to accompany H.R. 12846, 95th Cong., 2d Sess. 3–5 (1978), made it clear that the focus of H.R. 12846, like the Senate amendment to H.R. 13511, was structures used in agricultural and food production activities:

The bill clarifies present law by providing that structures and enclosures are specifically eligible for the investment credit where they are specifically designed, constructed and used for the *husbandry* of hogs and chickens or for the commercial *production* of plants and plant produce.

\* \* \* \* \* \* \*

The full range of swine and poultry *breeding, raising and production activities* are intended to be included so that special purpose structures will qualify for credit if used, for example, to *breed* chickens or hogs, or to *produce* feeder pigs, broiler chickens, or eggs. \* \* \*
[Emphasis added.]

---

[11]The specific language of the Senate amendment was as follows:

SEC. 314. INVESTMENT CREDIT FOR SINGLE PURPOSE AGRICULTURAL STRUCTURES.
    (a) IN GENERAL.—Section 48(a)(1) (relating to section 38 property), is amended by striking out the period at the end of subparagraph (C) and inserting in lieu thereof ", or", and by adding the following after subparagraph (C) thereof:
    "(D) a structure specifically designed, constructed, and utilized for *single purpose food and plant production*, including but not limited to production of eggs, poultry, and livestock."
    [H.R. 13511, 95th Cong., 2d Sess. 304–305 (Oct. 10, 1978). Emphasis added.]
    [12]The pertinent language of H.R. 12846 was as follows:

That (a) paragraph (1) of section 48(a) of the Internal Revenue Code of 1954 (defining section 38 property) is amended by striking out the period at the end of subparagraph (C) and inserting in lieu thereof ", or" and by inserting after subparagraph (C) the following new subparagraph:
    "(D) single purpose agricultural or horticultural structures."
    (b) Section 48 of such Code is amended by redesignating subsection (1) as subsection (m) and by inserting after subsection (k) the following new subsection:
    "(i) [sic] Single Purpose Agricultural or Horticultural Structure Defined.—For purposes of this section—
    "(1) In General.—The term 'single purpose agricultural or horticultural structure' means—
    (A) a single purpose poultry or hog structure, and
    (B) a single purpose greenhouse.
    "(2) Single Purpose Poultry or Hog Structure.—The term 'single purpose poultry or hog structure' means any enclosure or structure specifically designed, constructed, and used—
    "(A) for housing, raising, and feeding poultry or hogs and their produce, and
    "(B) for housing the equipment (including any replacements) necessary for the housing, raising, and feeding referred to in subparagraph (A)."

The conference agreement modified the Senate amendment to specifically extend the investment credit to special purpose structures used for livestock and horticultural products and to adopt the general conditions and requirements of H.R. 12846, *supra*. H. Rept. 95–1800, *supra*, 1978–3 C.B. (Vol. 1) at 561.

Petitioners argue that the omission of the specific "food and plant production" language of the Senate amendment from the final version of H.R. 13511 should be a significant factor in our interpretation of section 48(p)(2), citing *Carey v. Donohue*, 240 U.S. 430 (1916), and *Penna. R.R. Co. v. International Coal Co.*, 230 U.S. 184 (1913). Petitioners further contend that to give this legislative history effect, we must include within the statutory phrase "housing, raising, and feeding a particular type of livestock" activities such as the temporary boarding of household pets. We disagree.

The legislative explanations of section 48(p)(2) are replete with references to agricultural and food production. The Conference report on what became the Revenue Act of 1978, H. Rept. 95–1800 (1978), 1978–3 C.B. (Vol. 1) 521, 561, contains language similar to the language from H. Rept. 95–1761, to accompany H.R. 12846 (1978), quoted in the text, *supra*:

The full range of livestock *breeding, raising and production activities* is intended to be included so that special purpose structures will qualify for credit if used, for example, to *breed* chickens or hogs, to *produce* milk from dairy cattle, or to *produce* feeder cattle or pigs, broiler chickens, or eggs. * * * [Emphasis added.]

The Staff of the Joint Committee on Taxation stated as follows:

[Sections 48(a)(1)(D) and 48(p) make] structures or enclosures used for single purpose livestock or plant *production* specifically eligible for the investment tax credit. To be eligible for the credit under the Act, the structure must be both specially designed and used solely for the *production* of poultry, eggs, livestock, or plants * * * [Staff of Joint Comm. on Taxation, 96th Cong., 1st Sess., General Explanation of the Revenue Act of 1978, at 152 (J. Comm. Print 1979). Fn. ref. omitted; emphasis added.][13]

---

[13]See also Staff of Joint Comm. on Taxation, 95th Cong., 2nd Sess., Section-By-Section Summary of the Revenue Act of 1978, Energy Tax Act of 1978, Foreign Earned Income Act of 1978, Fringe Benefits Act; Prepared for the Use of the Committee on Ways and Means U.S. House of Representatives and the Committee on Finance U.S. Senate at 31 (J. Comm. Print 1978) ("The Act clarifies prior law by specifically providing that single purpose structures used to *produce* livestock, poultry, eggs, plants, and plant products are eligible for the investment credit." (Emphasis added.)); Staff of Joint Comm. on Taxation, 95th Cong., 2d Sess., Summary of Principal

These references contain language almost identical to that found in the report accompanying the Senate version of H.R. 13511, *supra*, which contained the "food or plant production" language.[14]

More importantly, the reason Congress enacted sections 48(a)(1)(D) and 48(p) clearly demonstrates that it did not intend to include structures like petitioners' kennel facility within the definition of a single purpose livestock structure. Since it was first added to the Code in 1962,[15] section 48(a) has always defined section 38 property to include, inter alia, tangible personal property and other tangible property (other than buildings and their structural components) but only if such other tangible property is an integral part of manufacturing, production, or other activities set forth in section 48(a)(1)(B). See secs. 48(a)(1)(A) and 48(a)(1)(B). When Congress reinstated the investment credit in 1971,[16] the Senate Finance Committee discussed in its report the types of structures that would qualify for the investment credit as other tangible property used in manufacturing, production, or other activities described in section 48(a)(1)(B). S. Rept. 92–437 (1971), 1972–1 C.B. 559, 575. The committee stated that one example of a qualifying structure was a structure used as a unitary hog-raising system. S. Rept. 92–437, *supra*, 1972–1 C.B. at 575. See Staff of Joint Comm. on Taxation, 96th Cong., 1st Sess., General Explanation of the Revenue Act of 1978, at 151 (Comm. Print 1979) (the General Explanation). Thus, the committee considered such structures to be used in production activities, farming having long been considered a production activity.[17] Despite the Senate Finance Committee's expression

---

Provisions of H.R. 13511, The Revenue Act of 1978; H.R. 5263, The Energy Tax Act of 1978; H.R. 9251, The Foreign Earned Income Act of 1978; H.R. 12841 (Pub. Law 95–427), Relating to Tax Treatment of Fringe Benefits at 15 (J. Comm. Print 1978) ("The application of present law is clarified for special purpose structures used to *produce* livestock (including poultry), plants, and their produce, so that these structures are specifically eligible for the credit." (Emphasis added.))

[14]S. Rept. 95–1263 (1978), 1978–3 C.B. (Vol. 1) 315, 414 ("To be eligible for the credit under the bill, the structure must be both specially designed and used solely for the *production* of poultry, eggs, livestock, or plants." (Emphasis added.))

[15]Sec. 2(b) of the Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, 963–970, 1962–3 C.B. 111, 114–120.

[16]The investment credit was, with certain exceptions, terminated by sec. 703(a) of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, 660–666, 1969–3 C.B. 10, 111–114. The investment credit was reinstated by sec. 101 of the Revenue Act of 1971, Pub. L. 92–178, 85 Stat. 497, 498–499, 1972–1 C.B. 443, 443–444, for property constructed or acquired after Aug. 15, 1971.

[17]Although the statement emphasizes that such structures were not buildings and thereby ineligible for the investment credit, it also clearly indicates that the committee considered such

of intent, the Internal Revenue Service continued a case-by-case approach in determining whether single purpose farm structures qualified for the investment credit. H. Rept. 95–1761, *supra* at 4–5; General Explanation, *supra* at 151. As the Senate report on H.R. 13511 (the Revenue Act of 1978), S. Rept. 95–1263 (1978), 1978–3 C.B. (Vol. 1) 315, 414, stated:

> When the investment tax credit was restored in 1971 it was the intention of the committee, as expressed in its report on the Revenue Act of 1971, to make it clear that the credit as restored was to apply to special purpose agricultural structures. Despite this expression of intent, the Internal Revenue Service has denied the credit to special purpose agricultural structures and enclosures used for raising poultry, livestock, horticultural products or for producing eggs. Taxpayers' litigation to establish their right to these credits is both expensive and troublesome, particularly in cases involving small farmers with limited amounts of eligible property. As a result of this continuing controversy, the committee has decided to specifically provide that these agricultural structures are eligible for the investment credit.

The House report on H.R. 12846 (which was subsumed into the Revenue Act of 1978, and became sections 48(a)(1)(D) and 48(p)), H. Rept. 95–1761, *supra* at 3–5, and the General Explanation *supra* at 151–152, cite this background as the reason sections 48(a)(1)(D) and 48(p) were enacted. H. Rept. 95–1761, *supra* at 5, further states as follows:

> This bill *clarifies present law* to specifically provide that certain greenhouses and poultry or hog structures and enclosures are eligible for the investment tax credit. *Because these provisions are regarded as clarifying amendments*, they are made applicable to taxable years ending after August 15, 1971, the date when the investment credit was restored. [Emphasis added.]

Thus, in 1971 Congress thought that single purpose agricultural structures qualified for the investment credit under section 48(a)(1)(B) as other tangible property used in production activities. When the Internal Revenue Service failed to so treat these structures, Congress enacted sections 48(a)(1)(D) and 48(p) to eliminate any doubt and to mandate such treatment. This legislative history makes it crystal clear that the term "single purpose livestock structure" as defined in

---

structures to be used in production activities. Farming has long been considered a production activity for sec. 48(a)(1)(B) purposes. See Rev. Rul. 66–89, 1966–1 C.B. 7.

section 48(p)(2) is not intended to encompass structures such as petitioners' kennel facility, which is used for the temporary boarding of household pets and is not a structure used in agricultural or food production. Such activity does not constitute "housing, raising, and feeding a particular type of livestock" within the meaning of section 48(p)(2)(A). Consequently, the kennel facility is not a single purpose livestock structure within the meaning of section 48(p)(2).[18]

## II. The Boarding Structure as an Item of Machinery or Equipment

Petitioners argue that even if the entire kennel facility is not a single purpose livestock structure, the rear portion thereof (the boarding structure) nevertheless qualifies as section 38 property because it is essentially an item of machinery or equipment within the meaning of sec. 1.48–1(e)(1), Income Tax Regs. Petitioners contend that because of its design, function, and use, the boarding structure operates as an apparatus necessary for the housing, care, and maintenance of the boarded animals and is therefore essentially an item of machinery or equipment. Because it is machinery or equipment, petitioners continue, the boarding structure is not a building for purposes of section 48, and therefore, it must be tangible personal property within the meaning of section 48(a)(1)(A).

In determining whether the boarding structure is section 38 property, we decline to focus on a clause in the regulations and back our way into the Code as petitioners would have us do. Rather, we think the proper order of analysis is to first carefully consider the statutory language, and then to look to the regulations for further guidance.

Sections 48(a)(1)(A) and 48(a)(1)(B) include in the definition of section 38 property both tangible personal property and other tangible property (not including a building and its structural components) but only if such other tangible property is used in activities described in section 48(a)(1)(B). As noted above, petitioners do not argue that the boarding structure is

---

[18]Although we need not reach the issue, we agree with respondent's other argument that household pets are not livestock within the meaning of sec. 48(p). See secs. 1.48–10(b)(3) and 1.48–1(l)(1), Income Tax Regs.

"other tangible property" used in one of the activities described in section 48(a)(1)(B). The term tangible personal property is not defined by the statute. However, section 1.48–1(c), Income Tax Regs.,[19] defines tangible personal property as "any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)." See *Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349, 405 (1981). Local law is not determinative of whether property is tangible or personal. Sec. 1.48–1(c), Income Tax Regs. The phrase tangible personal property is to be interpreted broadly. *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. 768, 797 (1980), revd. on another issue 708 F.2d 1385 (9th Cir. 1983); *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664, 671 (1975). Nevertheless, the regulation clearly states that tangible personal property does not include land and improvements thereto, such as buildings or other inherently permanent structures.

Despite this clear language, petitioners point to section 1.48–1(e)(1), Income Tax Regs.,[20] which defines the term

---

[19]Sec. 1.48–1(c), Income Tax Regs., provides as follows:

(c) *Definition of tangible personal property.* If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal". Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building, constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

[20]Sec. 1.48–1(e)(1), Income Tax Regs., provides as follows:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office

building for purposes of section 48 and the regulations thereunder. The regulation provides, inter alia, that the term building "does not include (i) a structure which is essentially an item of machinery or equipment." However, even if the boarding structure is not a building because it is essentially an item of machinery and equipment, that does not necessarily mean it is tangible personal property. Other inherently permanent structures as well as buildings are excluded from the definition of tangible personal property. See sec. 1.48–1(c), Income Tax Regs.

Neither the Code nor the regulations define the phrase inherently permanent structure. However, in *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. at 672–673, this Court enumerated the following six inquiries that we consider relevant in distinguishing between tangible personal property and inherently permanent structures:[21]

(1) Is the property capable of being moved, and has it in fact been moved?

(2) Is the property designed or constructed to remain permanently in place?

(3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved?

(4) How substantial a job is removal of the property, and how time-consuming is it? Is it "readily movable"?

(5) How much damage will the property sustain upon its removal?

(6) What is the manner of affixation of the property to the land?

---

buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

[21] See also *Southland Corp. v. United States*, 222 Ct. Cl. 22, 611 F.2d 348 (1979); *Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349, 406–409 (1981); *Kimmelman v. Commissioner*, 72 T.C. 294, 308 (1979).

The record is entirely devoid of any facts that, when considered in answering these six inquiries, suggest that the boarding structure is anything other than an inherently permanent structure. Moreover, at trial petitioners orally stipulated that the entire kennel facility, including the boarding structure, (1) is a permanent structure, (2) is fixed to the ground, (3) has a foundation, and (4) could not be moved without destruction of the property. Thus, even if the boarding structure is not a building, it is an inherently permanent structure and therefore is not tangible personal property within the meaning of section 48(a)(1)(A). Sec 1.48–1(c), Income Tax Regs.

Additionally, we think it clear that the boarding structure is not essentially an item of machinery or equipment and that it is therefore a building within the meaning of section 1.48–1(e)(1), Income Tax Regs. Although components of the boarding structure are specifically designed to aid the sanitary maintenance of boarded animals, the structure is not a mere processing chamber. See *Sunnyside Nurseries v. Commissioner*, 59 T.C. 113, 121 (1972). The boarding structure does not in itself feed, care for, or otherwise maintain the animals boarded therein. Rather, the boarding structure does no more than provide the setting in which the petitioners feed, care for, and otherwise maintain the boarded animals. *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. at 796. See *Yellow Freight System, Inc. v. United States*, 538 F.2d 790, 797 note 11 (8th Cir. 1976); *Endres Floral Co. v. United States*, 450 F. Supp. 16, 24 (N.D. Ohio 1977). Paraphrasing what we said in *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. at 796, "[the boarding structure is] no more an item of machinery to [feed, care for, and otherwise maintain the boarded animals] than the building in which the Tax Court is housed is an item of equipment to produce our opinions."[22] Thus, the boarding

---

[22]The present case is factually distinguishable from those cases where the building-like structures functioned not as the setting for human activity but functioned as part of the manufacturing or production process itself. See *Thirup v. Commissioner*, 508 F.2d 915 (9th Cir. 1974), revg. 59 T.C. 122 (1972) (greenhouses as essentially equipment or part of the manufacturing or production process of growing plants); *Brown-Forman Distillers Corp. v. United States*, 499 F.2d 1263 (Ct. Cl. 1974) (whiskey maturation structures served essentially as an "oven" to age the whiskey); *Satrum v. Commissioner*, 62 T.C. 413 (1974) (specifically designed walls, roof, and floors of "henhouse" served as integral part of egg-producing facility); *Central Citrus Co. v. Commissioner*, 58 T.C. 365 (1972) (the "sweet room" served to ripen and condition the fruit); *Catron v. Commissioner*, 50 T.C. 306 (1968) (facility to provide cold storage for apples); *Brown & Williamson*

structure is a building within the meaning of section 1.48–1(e)(1), and therefore is not section 38 property.[23]

### III. *The Horse Barn as a Single Purpose Livestock Structure*

Petitioners argue that their horse barn qualifies as section 38 property because it is a single purpose livestock structure within the meaning of section 48(p)(2). Respondent contends that the horse barn does not so qualify because it is a general purpose structure that could economically be used for a purpose other than the purpose for which it was specifically designed and constructed. This, respondent continues, precludes the horse barn from satisfying the statutory requirement that a qualifying structure be specifically designed and constructed for a qualifying purpose. See sec. 48(p)(2). Respondent also argues that horses are not livestock as the term is used in section 48(p)(2)(A). We agree with both of respondent's arguments.

Section 48(p)(2) defines a single purpose livestock structure as "any enclosure or structure specifically designed, constructed, and used" for described purposes. Section 1.48–10(d), Income Tax Regs., provides that "A structure is specifically designed and constructed if it is not economic to design and construct the structure for the intended qualifying purpose and then use the structure for a different purpose."

Petitioners' horse barn is a "Lester" general purpose design building. When petitioners constructed it, they varied the design by increasing its height, adding an overhang to one end of the building, and putting in windows. During 1976, the interior of the barn was one big open space. In subsequent

---

*Tobacco Corp. v. United States*, 369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F.2d 1258 (6th Cir. 1974) (tobacco sheds functioned to store and age the tobacco).

[23]Having held that the boarding structure does not by itself qualify as sec. 38 property, we need not determine the proper allocation of petitioners' cost for the kennel facility between the front structure and the boarding structure. See note 5 and accompanying text, *supra.*

Mr. McKenzie testified as to the portion of the kennel facility's cost he would allocate to the fencing throughout and surrounding the boarding structure. However, petitioners never argued that such fencing by itself qualifies as sec. 38 property. In any event, fencing is specifically excluded from the definition of tangible personal property. Sec. 1.48–1(c), Income Tax Regs.; *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. 768, 799 (1980), revd. on another issue 708 F.2d 1385 (9th Cir. 1983). Petitioners' fencing is not other tangible property used in one of the activities described in sec. 48(a)(1)(B) and therefore cannot qualify as sec. 38 property under that section. Thus, the fencing is not sec. 38 property, and we need not determine the portion of the kennel facility's total cost properly allocable to it.

years, petitioners installed two additional doors, put in stall and hay storage space, and made other improvements to the inside of the barn. They intend to make more improvements as they can afford them. Nonetheless, petitioners acknowledged on brief that the horse barn is a general purpose structure that could economically be used for purposes other than the purpose for which it was constructed. This acknowledgement is completely supported by the testimony at trial. Consequently, the horse barn was not specifically designed and constructed within the meaning of section 48(p)(2). Sec. 1.48–10(d), Income Tax Regs. See S. Rept. 95–1263 (1978), 1978–3 C.B. (Vol. 1) 315, 415, which stated that:

> The amendment [the forerunner of sections 48(a)(1)(D) and 48(p), see note 11 and accompanying text, *supra*] is not intended to apply to general purpose agricultural structures such as barns and other farm structures which can be adopted to a variety of uses.

Thus, the barn is not a single purpose livestock structure and therefore, is not section 38 property. Secs. 48(p)(2) and 48(a)(1)(D).

We also agree with respondent that horses are not livestock within the meaning of section 48(p)(2)(A). The regulations specifically exclude horses from the definition of livestock. Section 1.48–10(b)(3), Income Tax Regs., provides as follows:

> (3) *Livestock; particular type of livestock—(i) Livestock.* Livestock qualifying as "section 38 property" under sec. 1.48–1(l) constitutes livestock for purposes of this section. Thus, for example, horses are not livestock for purposes of this section since they do not qualify as "section 38 property" under sec. 1.48–1(l). Under section 48(p)(6) poultry constitutes livestock for purposes of section 48(a)(l)(D). The term "livestock" includes the offspring of livestock. "Livestock" is distinguished from the produce of livestock, such as milk and eggs held for sale. For purposes of this section, eggs held for hatching and newborn livestock are considered livestock. * * *

Section 1.48–1(l)(1), Income Tax Regs., also provides that:

> (l) *Livestock—(1) In general.* The term "section 38 property" does not include horses but such term does include all other livestock that is property described in section 50. The term "livestock" includes cattle, hogs, sheep, goats, and mink and other fur-bearing animals.

These are legislative regulations promulgated pursuant to specific statutory authority (sec. 38(b)), and as such are to be

accorded great weight. *Bingler v. Johnson*, 394 U.S. 741, 749–751 (1969); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496 (1948). We do not think these regulations are inconsistent with or go beyond the statute. We think the regulations implement the statute in a reasonable manner.

Petitioners argue that the mere fact that horses themselves do not qualify as section 38 property should not be determinative. However, petitioners have not suggested, and the Court cannot conceive of, any reason why the Congress would grant an investment tax credit for structures for housing, raising, or feeding horses if the animals themselves do not qualify for such a credit. We note that the statute itself expressly included poultry in the term "livestock." Sec. 48(p)(6). Petitioners have not pointed to anything in the statute or its legislative history, and the Court has not found anything, to support petitioners' argument that their Arabian horses qualify as livestock under section 48(p)(2).[24] We conclude that the regulations, at least as applied to the facts of this case, are valid.

To reflect the foregoing,[25]

*Decision will be entered for the respondent.*

---

[24]During consideration of H.R. 13511, the Senate proposed an amendment, effective after Dec. 31, 1978, to extend the investment credit to horses used for working or breeding purposes (but not horses used for sporting purposes such as race or show horses). The Conference agreement omitted this Senate amendment. H. Rept. 95–1800, 1978–3 C.B. (Vol. 1) 315, 562–563.

[25]In their petition and brief, petitioners requested that we award them attorneys' fees. The petition herein was filed on Jan. 8, 1982. Thus, this Court has no jurisdiction to award such fees in this case. *McQuiston v. Commissioner*, 78 T.C. 807 (1982), affd. without published opinion 711 F.2d 1064 (9th Cir. 1983). See also *Key Buick Co. v. Commissioner*, 613 F.2d 1306 (5th Cir. 1980), affg. 68 T.C. 178 (1977). Under sec. 7430, added to the Code by sec. 292(a) of the Tax Equity and Fiscal Responsibility Act of 1982, 96 Stat. 324, 572, 1982–2 C.B. 462, 546–547, we have authority to award reasonable litigation costs to a "prevailing party" in a proceeding commenced in this Court after Feb. 28, 1983. See also Rules 230–233. Moreover, Rule 34, in pertinent part, provides that "A claim for reasonable litigation costs *shall not be included in the petition* in a deficiency or liability action." (Emphasis added.) In general, under Rule 231 the time for making such claims is *after* the substantive issues have been resolved.